**In re the MARRIAGE OF Mary PARKER and Gary Parker.**

**Mary PARKER,**
**Petitioner–Respondent–Appellant,**

v.

**Gary PARKER,**
**Respondent–Appellant–Respondent.**

**Nos. 15545, 15547.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 15, 1988.

Robert P. Baker, Sarcoxie, for petitioner-respondent-appellant, Mary Parker.

Charles Buchanan, Joplin, for respondent-appellant-respondent, Gary Parker.

CROW, Presiding Judge.

By an amended decree entered December 2, 1987, the trial court (1) dissolved the marriage of Mary Parker ("Mary") and Gary Parker ("Gary"), (2) divided their marital property, (3) awarded custody of the youngest of their three unemancipated children to Mary and ordered Gary to pay Mary child support of $350 per month for such child, (4) awarded custody of the parties' other two unemancipated children to Gary, (5) ordered Gary to pay Mary maintenance of $600 per month for 36 months, and (6) required Gary to pay Mary's lawyer $3,500 for the latter's fee.

Gary appeals (number 15545), maintaining the trial court erred in (1) dividing the marital property, and (2) awarding Mary maintenance. Mary appeals (number 15547), insisting the trial court erred in (1) setting the maintenance at too low a figure and limiting its duration, (2) setting the child support at too low a figure, and (3) failing to require Gary to continue to provide "health insurance" for the child awarded to Mary.

We address Gary's appeal first.

Mary and Gary met in September, 1964, when she was a freshman at a chiropractic college and he was a sophomore at the same institution. They married April 3, 1965. Because of the birth of their first child (Kevin), Mary completed only one year of chiropractic school. Gary, however, continued his education, graduating in January, 1967. Gary, Mary and Kevin moved to Joplin, establishing their household in a home purchased with funds supplied by Mary's parents. Gary began his career as a chiropractor by purchasing a practice from another chiropractor, using funds borrowed from Mary's parents.

Three other children were ultimately born to Mary and Gary: Kyle on October 7, 1967, Gretchen on August 18, 1969, and Heather on April 10, 1973.

By the time the parties separated—December 19, 1985—their marital assets included two parcels of real estate: a lien-free home valued by the trial court at $91,250, and the office building where Gary conducts his chiropractic practice. The latter realty was valued by the trial court at $239,300 and, at time of trial, was subject to a deed of trust securing a note, the unpaid balance of which was $111,994.[1]

During the interval between the separation and the trial Gary purchased a home in which he, Kyle and Gretchen were residing at time of trial. That property was valued by the trial court at $49,900 and, at time of trial, was subject to an "outstanding mortgage" of $39,400. Additionally, Gary testified that at the time he bought the property he borrowed a total of $6,000 from three individuals to use as part of his down payment. At time of trial, according to Gary, he still owed those individuals a total of $4,350.

The trial court divided the marital real estate by (1) awarding the lien-free home to Mary and (2) awarding the office building and Gary's newly purchased residence to Gary.

The trial court awarded Mary marital personal property valued by the trial court at an aggregate net worth (according to our arithmetic) of $30,986. Included in that property were two motor vehicles and $5,350 in an individual retirement account.

Gary presented evidence that the value of the medical equipment used by him in his chiropractic practice was $22,460, against which there was a $13,537.57 lien, leaving a net value of $8,922.43. Other office contents and furnishings used by Gary in his chiropractic practice had, according to Gary's evidence, an aggregate net value of $8,865. The overall net worth of the assets described in this paragraph was, consequently, $17,787.43. In its amended decree the trial court assigned

that value to such property and awarded it to Gary. We henceforth refer to that property as the "chiropractic office contents."

Gary also had numerous accounts receivable owed him by his patients at time of trial. The trial court valued the accounts receivable, in the aggregate, at $12,500 and awarded them to Gary.

In addition to the chiropractic office contents and the accounts receivable, the trial court awarded Gary other marital personal property valued by the trial court (according to our arithmetic) at a net worth of $41,803. We henceforth refer to such property as "miscellaneous personal property." Included in the miscellaneous personal property was a motor vehicle driven by Gary and $8,500 in an individual retirement account. The miscellaneous personal property also included an organ that Mary acknowledged belonged to Kyle and a sewing machine that Mary conceded belonged to Gretchen. The value of the organ and sewing machine aggregated $6,000. Reducing the total of the miscellaneous personal property awarded Gary by deducting the $6,000 leaves $35,803 as the net value thereof.

No complaint is lodged here by either party regarding the values assigned by the trial court to the property heretofore discussed.

We now turn to the item that gives rise to Gary's contention that the trial court erred in dividing the marital property. Gary carries on his chiropractic practice under the name Parker Chiropractic Centre. Copies of income tax returns received in evidence at trial established that Gary's practice is a sole proprietorship. The amended decree, in enumerating the marital property awarded to Gary, listed the following item: "Goodwill of Parker Chiropractic Centre [$]58,000.00."

■ Gary, in component "A" of his first point, avers the trial court erred in finding that the value of "the goodwill of the chiropractic practice" was $58,000, as the only evidence to support such value was "without proper foundation and was speculative"

---

1. The cause was tried October 16, 1986.

and did not meet the standards of proof required by *Hanson v. Hanson*, 738 S.W. 2d 429 (Mo. banc 1987).

*Hanson*, as modified on denial of rehearing, was handed down October 13, 1987, almost a year *after* the instant case was tried [2] but seven weeks *before* the amended decree of December 2, 1987, was entered. So far as we can determine from the record furnished us, neither party called *Hanson* to the attention of the trial court prior to entry of the amended decree.

However, on December 11, 1987, Gary's lawyer filed a motion praying the trial court to amend the amended decree of December 2, 1987, by determining that the evidence was "insufficient to find any goodwill in the chiropractic practice other than through speculation and conjecture." In support of the motion, Gary's lawyer informed the trial court of *Hanson*. The trial court denied the motion, leaving the amended decree intact.

In *Hanson* the Supreme Court of Missouri stated:

"We granted transfer to determine whether our dissolution of marriage laws recognize the existence of goodwill in a professional practice as a marital asset and to determine the extent to which those laws permit the division of such goodwill upon dissolution of marriage." *Id.* at 430.

*Hanson* held that goodwill in a professional practice is a marital asset subject to division in dissolution proceedings. *Id.* at 431. *Hanson* defined goodwill within a professional setting as the value of the practice which exceeds its tangible assets and which is the result of the tendency of "clients/patients" to return to and recommend the practice irrespective of the reputation of the individual practitioner. *Id.* at 434[5]. *Hanson* cautioned, however:

"Professional goodwill may not be confused with future earning capacity. We have not declared future earning capacity to be marital property. We do not now do so." *Id.* at 435.

*Hanson* acknowledged that proof of the *existence* of goodwill is particularly troublesome in a professional context, as the reputation of the individual practitioner and the goodwill of his enterprise "are often inextricably interwoven." *Id.* Consequently, said *Hanson*:

"Because of the difficulties inherent in separating the reputation of the professional from that of his enterprise, evidence that other professionals are willing to pay for goodwill when acquiring a practice is, in our view, the only acceptable evidence of the existence of goodwill. Thus, as a matter of proof, the existence of goodwill is shown only when there is evidence of a recent actual sale of a similarly situated professional practice, an offer to purchase such a practice, or expert testimony and testimony of members of the subject profession as to the existence of goodwill in a similar practice in the relevant geographic and professional market. Absent such evidence, one can only speculate as to the existence of goodwill. Divisions of marital property may not be based on speculation as to the very existence of the property being divided." *Id.* at 435[6] (footnote omitted).

*Hanson* then went on to discuss how the *value* of goodwill is proved once its *existence* has been established. As shall become apparent *infra* we need not in this opinion address the problem of proving *value* because, as we shall henceforth explain, we find the evidence in the instant case insufficient under the *Hanson* rules to establish the *existence* of goodwill in Parker Chiropractic Centre.

Mary's evidence regarding the existence of goodwill in Parker Chiropractic Centre consisted of testimony from two witnesses: herself and Edwin Gene Denham, a certified public accountant.

Mary, on direct examination, was asked her opinion of the value of the "practice" of Parker Chiropractic Centre exclusive of the (1) accounts receivable, (2) chiropractic office contents, and (3) real estate where the office is situated. She answered: "My

---

2. Footnote 1, *supra*.

opinion as to its value. Its worth $75,000.00." On cross-examination Mary was asked how she had gone about calculating the value. She replied:

"I just meant by, if you were a new student getting out of college and you wanted someplace to practice, a lot times they will buy an established practice and with his being the largest in the area, with his good will, he has done courtroom work and everything else, he is well known, just everything together, he has got a good practice and somebody would buy the practice and his clientele and good will and established reputation."

Mary conceded she had no experience "evaluating any business, chiropractic business or otherwise."

Denham testified that during his 26 years as a certified public accountant he had on occasion valued "professional practices" in southwest Missouri, and that he had reviewed sundry business and financial records of Parker Chiropractic Centre. Denham was then asked if he could express an opinion "as to the value of the Parker Chiropractic practice exclusive of the building, office and medical equipment and the accounts receivables." Over Gary's objection that Denham's opinion was not based "on anything other than speculation and conjecture," Denham answered, "In my opinion, the value of that practice, exclusive of the tangible assets, the practice itself is about $80,000.00." Then, this:

"Q. ... how did you arrive at your opinion as to the value of the business exclusive of the tangible assets?

A. I reviewed the general make-up of the practice from a financial point of view. It appeared to be a substantial practice, well developed. From my prior knowledge of chiropractic practices in the past, coupling that with the review, I could tell that the practice had considerable loyalty in patients, had ongoing and continuing relationships with patients. It is a professional practice. From that I determined that the best approach to an evaluation would be to base the value on gross revenue from the practice.

. . . .

Q. Would you ... explain to the Court how you arrived at your values that you established....

A. Because of the nature of the profession practice, I used a factor of 75 percent of the gross income. The 75 relates to the ongoing continuing relationship of the doctor and his patients. Other percentages could be 100 percent of 150 percent depending on the kind of professional practice we are talking about. I chose 75 percent for this particular purpose. Ordinarily a practice like this is sold on a percentage basis and is generally paid or satisfied over a fiveyear period and there's generally a discount or a factor for patient retention. So in finding what the value is today, I have applied the 75 percent to annual revenue using 1985 as a representative base period. It has been my experience that retention of clients or patients in a professional practice generally runs from 80 to 90 percent. I used a retention factor of 80 percent for this purpose. At that point, I arrived at what I felt was the gross value of the practice over the next five years. I then discounted that gross value for a present value today. The numbers are as follows: The gross fees in the last fiscal year were $196,000.00; 75 percent of that figure is $147,000.00. The retention adjustment, I used a 20 percent or an 80 percent retention or a 20 percent discount, that added up to $29,000.00, leaving a net gross value of $118,000.00. The present value of $118,000.00 today would be approximately $80,000.00.

Q. What was the discount factor you used to arrive at the present value?

. . . .

A. Based on an 8 percent rate."

Denham's testimony on cross-examination included this:

"Q. ... How many chiropractic practices have you been involved in, in the sale?

A. None, in the sale.

. . . .

Q. One way to determine a fair market value is to find what we call is comparables, isn't it?

A. Yes.

Q. Did you do that?

A. No, I had no comparable resources."

■ Nowhere in the testimony of Mary or Denham was there any showing of (1) a recent actual sale of a similarly situated professional practice, (2) an offer to purchase such a practice, or (3) expert testimony and testimony of members of the subject profession as to the existence of goodwill in a similar practice in the relevant geographic and professional market. *Hanson,* as we read it, holds that the *existence* of goodwill in a professional practice can be established only by one of those three methods. It is thus manifest that Mary's evidence failed to satisfy the *Hanson* requirements as to proof of the existence of goodwill in Parker Chiropractic Centre.

Nothing in Gary's evidence aids Mary.

Thomas Cusack, a certified public accountant, testifying for Gary, professed no expertise in determining the goodwill of a chiropractic practice and voiced no opinion on either the existence or value of goodwill of Parker Chiropractic Centre.

Gary, testifying in support of his contention that Parker Chiropractic Centre had no goodwill value, said:

"From personal experience from purchasing a practice in 1967, and the purchasing of what I thought was sufficient good will, from a doctor who had a fairly good practice and watching my practice virtually, absolutely zip, as a result of my taking over and the patients not accepting a new chiropractor, I feel that another doctor walking into an existing practice and trying to assume or practice on those patients, assuming patient good will and a rapport that's been built up between those patients and doctors, that is not a tangible asset that you can sell. It is not something that is worth anything."

■ As the existence of goodwill of Parker Chiropractic Centre was not established by evidence meeting the requirements of *Hanson,* we must decide what to do about the trial court's finding that Parker Chiropractic Centre had goodwill worth $58,000 and the trial court's award of the goodwill to Gary. *Hanson* itself supplies some guidance. *Hanson* consisted of two dissolution cases involving different couples, consolidated by the Supreme Court of Missouri for disposition in one opinion. The husbands in the two cases were partners in the same oral surgery partnership. The trial court in the first of the two cases assigned a value to the husband's interest in the partnership that was evidently based, at least in part, on goodwill. A different trial court in the second case found no goodwill value in the partnership. In each case the husband presented evidence at trial that the partnership had no goodwill value, and in neither case did the wife present evidence that would satisfy the requirements of *Hanson* in establishing the existence of goodwill.

In determining how to dispose of the appeals in *Hanson* the Supreme Court said:

"In this case of first impression, we have recognized goodwill in a professional practice as property subject to division in a dissolution of marriage proceeding. We have also approved a limited means of proving and valuing that goodwill in a professional context.

... On the evidence before it, the trial court in [the second case] properly found no goodwill value in the practice. Under different circumstances, we would affirm the trial court in [the second case].

Given the nature of our decision, however, our sense of justice dictates that we allow the nonprofessional spouses in each case an opportunity to present fair market value evidence of goodwill value in this practice." 738 S.W.2d at 439.

The judgments of the trial courts in both cases in *Hanson* were reversed and remanded for proceedings consistent with *Hanson. Id.*

Additional guidance is supplied by *Townsend v. Townsend,* 708 S.W.2d 646 (Mo. banc 1986), where the Supreme Court of Missouri abolished the common law doc-

trine of interspousal immunity as a bar against claims for personal injuries intentionally inflicted by one spouse against the other during marriage. The Supreme Court made its holding in *Townsend* applicable to all actions in which a final order, decree or judgment had not been entered as of the date of issuance of the opinion. *Id.* at 650[4].

In the instant case, as we have seen, *Hanson* was decided seven weeks before the trial court entered its amended decree December 2, 1987, and was brought to the trial court's attention by Gary's lawyer nine days after entry of that decree, at a time when the trial court still had authority to vacate, reopen, correct, amend or modify such decree. Rule 75.01, Missouri Rules of Civil Procedure (18th ed. 1987). The trial court consequently had an opportunity to consider the implications of *Hanson* while the amended decree was still subject to the trial court's control. Gary's appeal is not, therefore, one where we are asked to apply case law handed down after the trial court was powerless to change its decree.

The impact of the trial court's finding that Parker Chiropractic Centre had goodwill worth $58,000 and the trial court's assignment of such asset to Gary in the division of marital property becomes apparent when we consider the following circumstances.

Mary, as reported earlier, was awarded marital property consisting of the lien-free home valued at $91,250, together with personal property having an aggregate net value of $30,986. Additionally, Mary testified she had cash on hand totaling $2,800. The sum of these assets is $125,036.

Gary, as reported earlier, was awarded the following marital property:

1. The tract on which the office building is situated, valued at $239,300 and subject to a lien of $111,994, leaving a net value of $127,306.

2. The home purchased by Gary after the separation, valued at $49,900 and subject to an "outstanding mortgage" of $39,400. The net worth of this asset is thus ostensibly $10,500. It will be remembered, however, that Gary testified, without con-

tradiction, that he still owed three individuals a total of $4,350 on loans which supplied part of the down payment. Reducing the net value of $10,500 by the $4,350 debt leaves a net value of $6,150.

3. The chiropractic office contents, net value $17,787.43.

4. Accounts receivable, net value $12,500.

5. Miscellaneous personal property, net value $35,803.

6. Goodwill of Parker Chiropractic Centre, value $58,000.

The sum of the net values of the items in paragraphs numbered 1 through 6, above, is $257,546.43. Additionally, Gary testified he had cash on hand totaling $7,500 to $8,000. Adding $8,000 to the aggregate net value of the items in paragraphs 1 through 6 produces a total of $265,546.43.

The $265,546.43 value, as we have seen, takes into account the debts in paragraphs "A" through "D," below.

A. The $111,994 secured by the lien on the tract where the office building is situated. From the exhibits supplied us it appears that while Mary and Gary both signed the deed of trust creating the lien, Gary alone signed the note evidencing the debt.

B. The $13,537.57 secured by the lien on the chiropractic office contents. From the exhibits supplied us it appears that Gary alone signed the security agreement creating the lien and the note evidencing the debt.

C. The $39,400 secured by the "outstanding mortgage" on the home purchased by Gary after the separation. We find no details regarding this debt in the record except Gary's testimony that he "financed" the purchase through Commerce Bank in Joplin.

D. The $4,350 owed by Gary to the three individuals from whom he borrowed part of the money he used for the down payment on the home referred to in paragraph C.

Besides the debts listed in paragraphs A through D, above, Gary presented evidence of the following additional debts.

Federal and state income taxes and "Self–Employment Tax" totaling $18,312 at time of trial.

$4,699.92 owed a bank for funds borrowed to buy computer equipment. As best as we can determine from the record, Gary alone is liable on this obligation.

Twelve separate debts owed sundry creditors shown on Respondent's Exhibit K. These total $1,787.37. Gary testified he owed them but did not reveal whether Mary was also liable.

Respondent's Exhibit L which, as we read it, lists 23 separate debts and one credit. The total of the debts is $6,097.05. Deducting the credit ($106.12) leaves $5,990.93, the figure shown at the foot of the exhibit. Among the "debts" are installment payments due on the obligations mentioned earlier by us in paragraphs A and B, respectively. Another "debt" on Respondent's Exhibit L appears to be an installment due on the $4,699.92 owed for funds borrowed to buy computer equipment, also mentioned earlier. The sum of the three installments is $1,959.73. Deducting that amount from the total on Respondent's Exhibit L ($5,990.93), leaves a balance of $4,031.20. Respondent's Exhibit L characterizes the debts thereon as "business bills." While it is inferable that Mary is not liable for any of them, there is no firm evidence on the subject.

Respondent's Exhibit M lists debts to "Visa," "Sears," "Penneys" and "Wards" totaling $11,200. Gary testified that sum included purchases of household goods and furnishings for the home he purchased after the separation. The record is silent as to whether Mary is liable for any of those obligations.

The total net indebtedness reflected in the five paragraphs immediately preceding this one is $40,030.49. We henceforth refer to such indebtedness as the "miscellaneous debts," to distinguish such indebtedness from the debts mentioned by us earlier in paragraphs A through D.

The trial court filed findings of fact and conclusions of law May 28, 1987, six months prior to entry of the amended decree. The only debts mentioned in the findings of fact and conclusions of law were those secured by the lien on the tract where the office building sits and by the "outstanding mortgage" on the home purchased by Gary after the separation (paragraphs A and C, *supra*). The amended decree contains no reference to any indebtedness. The amended decree does, however, order Gary to pay Mary $50,000 "as an equalization of the division of marital property." The $50,000 is to be paid in specified installments.

The result of the amended decree, according to our computations in this opinion, is to award Mary marital property with an aggregate net value (including cash on hand) of $125,036, plus the $50,000 "equalization," making a total of $175,036. The amended decree, according to our computations, awards Gary marital property with an aggregate net value (including cash on hand) of $265,546.43. Deducting the $50,000 "equalization," Gary is left with $215,546.43.

It must be remembered, however, that the marital property awarded Gary by the amended decree includes $58,000 for goodwill of Parker Chiropractic Centre. We have already decided there was no evidence meeting the requirements imposed by *Hanson* to establish the *existence* of such goodwill.

Furthermore, the amended decree says nothing about the miscellaneous debts of $40,030.49 reflected in Gary's evidence, and, as the trial court's findings of fact and conclusions of law likewise ignore those debts, we do not know whether the trial court believed or disbelieved Gary's evidence about them.

If we reduce the value of the marital assets awarded Gary by deducting the $58,000 attributed to goodwill of Parker Chiropractic Centre, Gary (after paying Mary the $50,000 "equalization") is left with $157,546.43. If we assume Gary will pay the miscellaneous debts ($40,030.49) and that Mary will escape them (either because

Gary pays them or because Mary is not liable for them), Gary ends up with $117,-515.94, compared to Mary's $175,036. The financial result of the instant case is thus profoundly affected by the $58,000 found by the trial court to be the value of the supposed goodwill of Parker Chiropractic Centre, and by the miscellaneous debts of $40,030.49 (assuming such debts exist).

Given these factors we cannot, in the face of *Hanson,* affirm the trial court's division of the marital property. Inasmuch as *Hanson* was (1) decided before the trial court entered the amended decree, and (2) called to the trial court's attention by Gary's lawyer while the trial court still had power to vacate, reopen, correct, amend or modify such decree, we are persuaded by the holdings of the Supreme Court of Missouri in *Hanson* and *Townsend* that the correct ruling on component "A" of Gary's first point is to hold that the *Hanson* requirements as to proof of the existence of goodwill in a professional practice apply, and that because the existence of goodwill in Parker Chiropractic Centre was not established by evidence satisfying those requirements the trial court erred in finding that Parker Chiropractic Centre had goodwill worth $58,000. As that $58,000 constituted almost 22 percent of the $265,546.43 net value of the marital property awarded Gary by the amended decree (prior to reduction by the $50,000 "equalization"), we cannot assume the trial court would have ordered Gary to pay Mary the $50,000 had the trial court found no goodwill value in Parker Chiropractic Centre.

■ Accordingly, the portion of the amended decree dividing the marital property cannot stand. While we should, if possible, exercise our authority under Rule 84.14, Missouri Rules of Civil Procedure (19th ed. 1988), to enter such decree as the trial court should have entered, *Oldfield v. Oldfield,* 688 S.W.2d 778, 781[4] (Mo.App. 1985); *Steinmeyer v. Steinmeyer,* 669 S.W.2d 65, 68[14] (Mo.App.1984), we should not do so absent a record and evidence upon which we can perform that function with some degree of confidence in the reasonableness, fairness, and accuracy of our conclusion. *Taylor v. Coe,* 675 S.W.2d 148, 150[4] (Mo.App.1984); *In re Estate of Kranitz,* 610 S.W.2d 300, 304[1] (Mo.App. 1980). We cannot undertake that task here because of the absence of a finding by the trial court regarding the existence or non-existence of the miscellaneous debts of $40,030.49.

It is thus necessary to remand the case to the trial court for findings as to such indebtedness. In so holding we do not imply we would have ordered remand if the trial court's only omission regarding the $40,030.49 miscellaneous debts had been failure to apportion the responsibility for paying them between Mary and Gary. The difficulty confronting us regarding such debts is not so much the lack of apportionment, but instead the absence of findings by the trial court as to (a) whether such debts exist, and (b) the respective liability of Gary and Mary to the creditors on such debts as do exist. The existence and extent of marital debt and who will be responsible for payment are factors to be considered in establishing a fair division of the marital assets. *In re Marriage of Smith,* 652 S.W.2d 743, 743–44[2] (Mo.App.1983); *In re Marriage of Kluba,* 647 S.W.2d 920, 921[1] (Mo.App.1983). Without such findings by the trial court we cannot determine what the financial outcome of the dissolution of this marriage will be.

As remand is required, we have decided Mary should be allowed an opportunity to prove to the trial court, if she can, the existence of goodwill in Parker Chiropractic Centre by evidence satisfying the requirements of *Hanson.* That comports with the disposition of the appeals by the Supreme Court of Missouri in *Hanson,* where the Court remanded both dissolution cases to the respective trial courts to give the nonprofessional spouses an opportunity to present evidence of goodwill satisfying the *Hanson* requirements.

In reaching that conclusion we do not overlook *Taylor v. Taylor,* 736 S.W.2d 388 (Mo. banc 1987), a dissolution case which involved, among other issues, the question of goodwill in a chiropractic practice. In *Taylor* the trial was held, the decree was

entered, and the appeal was taken prior to *Hanson.* The wife in *Taylor* was a chiropractor. The husband offered evidence at trial that the chiropractic practice had goodwill value. The trial court, however, found otherwise. On appeal the husband assigned error in the trial court's refusal to attach a monetary value to the goodwill of the chiropractic practice. The Supreme Court of Missouri held that inasmuch as the husband's evidence did not meet the requirements of *Hanson* regarding proof of the existence of goodwill, the trial court properly concluded there was no goodwill value in the chiropractic practice. *Id.* at 390[1]. The Supreme Court affirmed the decree, declining to give the husband a second opportunity to prove the existence of goodwill.

While it appears *Taylor* would support an argument that Mary should not have a second opportunity to prove goodwill, there are differences between *Taylor* and the instant case. Here, as observed earlier, *Hanson* was decided prior to entry of the amended decree and was called to the trial court's attention while the trial court still had power over the amended decree. In *Taylor* the appeal had long since been taken when *Hanson* was decided. Additionally, the nonprofessional spouse in *Taylor* lost on the issue of goodwill in the trial court, thus the ruling of the appellate court took nothing from the nonprofessional spouse that such spouse had won in the trial court. In the instant case Mary won in the trial court on the issue of goodwill, and our holding nullifies that victory. If the nonprofessional spouse in the first case in *Hanson* was entitled to a second chance to prove the existence of goodwill by evidence satisfying the requirements of *Hanson,* Mary is no less entitled to such opportunity here.

We now turn to component "B" of Gary's first point, which charges the trial

court with error in dividing the marital property in that the court "did not allocate the debts of the parties and ... erred in failing to consider that [Gary], as the sole wage earner, would pay the debts and failed to consider this debt as a factor in the division of property." What we have said earlier regarding indebtedness is germane to that complaint.

We need not, in this opinion, embark on a comprehensive discussion of the subject of division of debts owed jointly by husbands and wives in dissolution cases. The subject is adequately covered in *Costley v. Costley,* 717 S.W.2d 540, 543–44 (Mo.App.1986), which affirmed a provision in a dissolution decree ordering the husband to pay certain "marital indebtedness" and subjecting his separate property to a lien to secure payment. Apportioning the responsibility for paying debts in the instant case may turn out to be unnecessary, as the evidence on remand may establish that most, if not all, of the debts (if indeed they exist) are owed by Gary alone. If, however, the evidence establishes a sizeable amount of indebtedness owed jointly by Gary and Mary, the trial court should consider *Costley* in determining what, if any, orders are appropriate regarding apportionment of joint indebtedness.

It should be apparent from what we have said that we cannot adjudicate Gary's second point, which alleges the trial court erred by awarding Mary maintenance or, in the alternative, by setting the figure too high. Among the factors required by § 452.335.2, RSMo 1986, to be considered by a trial court in determining the amount and duration of maintenance at the time the amended decree was entered in the instant case was the ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance. § 452.335.2(6), RSMo 1986.[3]

**3.** Section 452.335, RSMo 1986, was amended effective August 13, 1988, by Laws, Eighty-fourth General Assembly, 1988 Second Regular Session, H.B. Nos. 1272, 1273 and 1274. Vernon's Missouri Legislative Service, No. 4, August, 1988, pp. 549–64. The amending legislation added to § 452.335, as additional factors to

be considered in determining the amount and duration of maintenance, the comparative earning capacity of each spouse (new § 452.335.2(3)), and the obligations and assets, including the marital property apportioned to him and the separate property of each party (new § 452.335.2(5)).

If there are indeed miscellaneous debts totaling $40,030.49, and if Gary alone is liable on most, or all, of those debts, such liability will affect his ability to meet his needs while meeting those of Mary. If there are debts on which Gary and Mary are jointly liable, any apportionment by the trial court of liability for such debts to Mary will affect Mary's needs and also have a bearing on Gary's ability to meet his needs while meeting those of Mary. It is thus impossible to consider Gary's assignment of error regarding maintenance when the amount of indebtedness and the liability therefor remain unresolved.

The same considerations apply to Mary's first assignment of error in her appeal (number 15547), which alleges the trial court erred in awarding an insufficient amount of maintenance and in limiting its duration to 36 months.

We are similarly unable to decide Mary's second and third points, which complain, respectively, that the sum awarded her as child support for Heather was too low, and that the trial court should have, but did not, require Gary to continue to provide "health insurance" for Heather. One of the factors required by § 452.340, RSMo 1986, to be considered by a trial court on the issue of child support at the time the amended decree was entered in the instant case was the financial resources and needs of the noncustodial parent. § 452.340(6), RSMo 1986.[4] Until the net value of the marital property to be awarded Gary is determined and the indebtedness for which he is liable is ascertained, his financial resources cannot be assessed.

We therefore hold that those provisions of the amended decree dividing the marital property, awarding Mary maintenance, and ordering Gary to pay Mary child support for Heather must be reversed. All other provisions of the amended decree are affirmed.

The cause is remanded to the trial court for redetermination of (a) the division of marital property, (b) maintenance for Mary,

and (c) child support to be paid to Mary by Gary for Heather, including whether Gary should be ordered to provide "health insurance" for Heather.

As to division of marital property we do not imply that any item heretofore awarded either party should be awarded to the other. At this late date it would be impractical to do so. If, after reconsidering the issue of goodwill of Parker Chiropractic Centre, the trial court finds, from evidence satisfying the requirements of *Hanson,* that there is goodwill having monetary value, the trial court can, if necessary, order Gary to pay Mary such sum as will effect a proper balance in the division of marital assets. The trial court should also determine the amount of indebtedness owed by the parties, separately and jointly, and, if necessary in determining the division of marital property, apportion the joint debts in such manner as the trial court sees fit. The trial court should then redetermine the issues of maintenance for Mary and child support and health insurance for Heather.

Once all of those questions are resolved the trial court should enter a new decree disposing of all issues between the parties, including all provisions of the amended decree affirmed by this opinion. Any amounts heretofore paid by Gary to Mary under the latter decree should, of course, be credited against any amounts awarded Mary in the new decree.

HOLSTEIN, C.J., and GREENE, J., concur.

---

**4.** Section 452.340, RSMo 1986, was amended effective August 13, 1988, by the legislation identified in footnote 3, *supra.* New § 452.340.1(2) provides that in determining child support the court shall consider the financial resources and needs of the parents.