In re the **MARRIAGE OF Helen Marie STEPHENS and Michael Joe Stephens.**

**Helen Marie STEPHENS,**
**Petitioner/Appellant/Cross–Respondent,**

v.

**Michael Joe STEPHENS,**
**Respondent/Respondent/Cross–Appellant.**

**Nos. 21098, 21109.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 31, 1997.

James R. Sharp, Wear & Sharp, Springfield, for Appellant.

C. Ronald Baird, Mark J. Millsap, Baird, Lightner & Millsap, P.C., Springfield, for Respondent.

CROW, Judge.

By a decree filed March 21, 1996, the trial court dissolved the marriage of Helen Marie Stephens ("Wife") and Michael Joe Stephens ("Husband"). Both parties appeal.

Wife maintains the trial court erred in: (1) assigning too low a value to a pharmacy owned by the parties, (2) awarding Wife less than half the "net marital estate," (3) awarding Wife insufficient maintenance, and (4) awarding Wife insufficient child support for the parties' two youngest children. Husband maintains the trial court erred in: (1) awarding Wife maintenance, and (2) failing to order a total abatement of child support for each of the two youngest children if each attends college and does not reside with Wife.

The parties married July 2, 1967. The union produced three children: Mary Helen, born May 20, 1974; Carmen Marie, born July 1, 1978; Nancy Michele, born February 26, 1980.

The parties' pharmacy—the subject of Wife's first point—is Stephens Pharmacy in Bolivar. The parties started it January 1, 1975. Husband is a pharmacist, having received a bachelor of science degree in pharmacy in 1971. Wife received a bachelor of science degree in education in 1968. Both worked at the pharmacy. Each was 49 years of age at time of trial.

The pharmacy occupies part of a building owned by the parties. The trial court valued the building (together with the land on which it sits) at $312,500. For convenience, we henceforth refer to that asset as "the business real estate."

The decree treats the business real estate and the pharmacy as separate assets.

Wife's evidence regarding the value of the pharmacy as a separate asset came from William J. Meyer, a certified public accountant. Meyer avowed the "capitalization of earnings approach" was the method a prospective buyer would use in valuing the pharmacy. Employing that method, Meyer concluded the fair market value of the pharmacy was $774,690.

Husband presented testimony by Elmer Selim, a certified public accountant, regarding the pharmacy's value. Selim used two methods, one of which was "capitalization of earnings." According to Selim, that method produced a fair market value of $231,579.

The trial court valued the pharmacy at $267,684 and awarded it to Husband.

■ Wife's first point:

"The trial court erred in valuing the family business, Stephen's [sic] Pharmacy, at $267,684.00, instead of at $774,690.00 as testified to by Wife's expert, in that said valuation is against the weight of the evidence and is not supported by substantial evidence because the trial court found that said business was a retail establishment and not a professional practice and the only creditable evidence presented to the court concerning the value of the business as a retail establishment was from Wife's expert, William Meyer, . . . who testified that its fair market value as a retail establishment was $774,690.00, considering that the business had been earning a net profit in excess of $200,000.00 per year for the two years before trial."

The goal of Wife's first point is a mandate from us remanding the case to the trial court with a directive to assign the pharmacy a value of $774,690 and to award Wife a money judgment against Husband to compensate her for her interest in the pharmacy at that value.

There was an issue at trial about the extent (if any) to which goodwill[1] could be considered in determining the value of the

---

1. We learn from *Hanson v. Hanson,* 738 S.W.2d 429, 433 (Mo. banc 1987), that courts have defined goodwill as nothing more than the probability that the old customers will resort to the old place. *Hanson* explains: "[T]he goodwill which can be sold, and is therefore property, attaches not to an individual but to a business entity. Goodwill has no separate existence; it has value only as an incident of a continuing business." *Id.*

pharmacy. Inherent in that issue was the question of whether the pharmacy should be treated as a professional practice or a retail business. If the pharmacy is a professional practice, the existence (if any) of goodwill, and its value, can be shown only by fulfilling the evidentiary requirements in *Hanson v. Hanson*, 738 S.W.2d 429, 435–36 (Mo. banc 1987). Husband insists the pharmacy should be deemed a professional practice for purpose of valuation.

Wife's expert, Meyer, testified that pharmacies differ from the practices of physicians, lawyers, and accountants in that the latter practitioners "dispense cognitive services," whereas pharmacists sell medicine and other "tangible goods" which a consumer can take home and use. Meyer's testimony did not meet the standard of *Hanson* for proving the existence and value of goodwill in a professional practice, and Wife presented no other evidence meeting that standard.

As reported earlier, Husband's expert, Selim, used two methods to value the pharmacy. One, "capitalization of earnings" (also used by Meyer), has already been noted in this opinion. The other method used by Selim was the "net asset value" method. As we comprehend Selim's testimony, that method recognizes no value attributable to goodwill. That method, according to Selim, showed the pharmacy was worth $215,000. In contrast, the $231,579 fair market value Selim calculated using the "capitalization of earnings" method included goodwill. However, neither Selim's testimony nor any of Husband's other evidence met the *Hanson* standard for proving goodwill in a professional practice.

The record demonstrates—as indicated in Wife's first point—that the trial court found the pharmacy "is a retail establishment as opposed to a professional practice." The trial court further found that "the capitalization of earnings approach [is] the most appropriate way of valuing [the pharmacy]."

In response to Wife's first point, Husband maintains the trial court did not err in valuing the pharmacy at $267,684 (even though that figure is higher than either of the sums calculated by Selim). Inasmuch as Husband takes that position, it is obvious that if we deny Wife's first point, we need not decide whether the trial court was correct in treating the pharmacy as a retail business instead of a professional practice.

Wife's expert, Meyer, avowed Stephens Pharmacy has goodwill that can be sold. Included in the goodwill are the pharmacy's location and the pharmacy's reputation. However, when asked by Husband's lawyer whether he (Meyer) could tell the court how much of the pharmacy's fair market value was attributable to goodwill, Meyer replied, "I can't provide that."

Meyer calculated the average "adjusted net earnings" of the pharmacy for the years 1990–95 were $182,280. He then applied a "capitalization rate" and deducted an amount for "lack of marketability." That exercise produced his appraisal, $774,690.

Meyer conceded he did not deduct the cost of employing a pharmacist to operate the pharmacy, nor did he deduct any amount for rent to provide quarters for the pharmacy. His calculations were based on the assumption that a buyer of the pharmacy would be a pharmacist. Meyer acknowledged it would be "crazy" to advise a non-pharmacist to buy the pharmacy for $774,690.

Husband's expert, Selim, testified that in valuing the pharmacy by the "capitalization of earnings" method, it would be "suicide" for a prospective buyer to fail to consider the cost of employing a pharmacist to operate it. According to Selim, the "base salary" of a pharmacist would be $47,000, to which Selim would add "20 percent for the benefits." Furthermore, explained Selim, it is a "serious error" to fail to consider the cost of renting space to house the pharmacy.

The trial court found Meyer's valuation of the pharmacy was flawed in that Meyer failed "to take into account any salary for the pharmacist or owner of the business and [failed] to take into account any rent or cost factor for the building which was not part of the business." The trial court further found that the capitalization rate and the discount rate for lack of marketability are subjective, and the court was unable to determine whether the rates used by Meyer or Selim were correct. Beyond those findings, the

decree yields no clue as to how the trial court arrived at $267,684 as the pharmacy's value.

The parties cite scant authority on valuing a family business in a dissolution case. *Hanson*, cited by both sides, involved a professional practice (oral surgery). 738 S.W.2d at 430. *In re Marriage of Brooks*, 742 S.W.2d 585 (Mo.App. S.D.1987), cited by Wife, involved a machine and tooling company. *Id.* at 587.

There are at least two other cases on the subject, but neither is helpful, as each involved a chiropractic practice. *Taylor v. Taylor*, 736 S.W.2d 388 (Mo. banc 1987); *In re Marriage of Parker*, 762 S.W.2d 506 (Mo. App. S.D.1988).

Wife argues that Meyer's valuation was not flawed in that "the most likely purchaser would be a pharmacist, whose 'salary' would be the earnings of the business." However, it must borne in mind that if a pharmacist who already owns a pharmacy (and works there full time, as did Husband and Wife) chooses to buy Stephens Pharmacy, the pharmacist will have to employ a pharmacist to operate it.

Furthermore, as we understand the decree, the trial court valued all remaining marital property, in the aggregate, at $903,948.59. However, there were debts, including $184,939 secured by a lien on the business real estate, and $71,335 secured by a lien on the marital residence. Those two debts alone (there were others) reduce the net value of the marital assets (excluding the pharmacy) to $647,674.59.

Had the trial court awarded Wife the pharmacy at a value of $774,690 (Meyer's appraisal) and awarded Husband all remaining marital assets—a net value of $647,674.59 (a misleading sum in that it does not take into account $56,000 in additional debts Husband was ordered to pay)—we suspect Wife would have strenuously complained that the division was unfair to her (even though on paper her share would exceed Husband's by $127,015.41), as she would have to hire a pharmacist to run the pharmacy and either find another location for it or pay Husband rent for the existing site.

The standard of appellate review for a judge-tried case set forth in Rule 73.01(c), Missouri Rules of Civil Procedure (1997), and *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976), applies to appeals from decrees of dissolution of marriage. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). The decree will be affirmed unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* Appellate courts recognize trial courts are free to believe or disbelieve all, part or none of the testimony of any witness. *Id.* at [1].

Here, the trial court was presented testimony by two experts. Purporting to use the same method ("capitalization of earnings"), one valued the pharmacy at $774,690, the other at $231,579, a difference of $543,111. Obviously, at least one expert was wrong.

The trial court, for the reasons recited earlier in this opinion, found the testimony of Wife's expert, Meyer, unconvincing. However, the trial court likewise rejected the figure of Husband's expert, Selim. The trial court valued the pharmacy at a sum $507,006 below that of Meyer, but $36,105 above that of Selim.

Inasmuch as (1) the value assigned by the trial court was within the range of values in the evidence, *cf. Arkansas–Missouri Power Co. v. Haines*, 592 S.W.2d 883, 885–86[8] (Mo.App. S.D.1980); *DeArmon v. City of St. Louis*, 525 S.W.2d 795, 801[13] (Mo.App. 1975), and (2) an appellate court defers to the trial court even if the evidence could support a different conclusion, *McKenna v. McKenna*, 928 S.W.2d 910, 911[4] (Mo.App. E.D. 1996); *Wynn v. Wynn*, 738 S.W.2d 915, 918 (Mo.App. E.D.1987), we hold the trial court did not err in valuing Stephens Pharmacy at $267,684 instead of $774,690.

In so holding, we do not ignore Wife's reminder that the pharmacy had a "net profit" in excess of $200,000 in each of the two years preceding trial. However, the parties' accountant (not Meyer or Selim) explained that those figures reflected only a "modest amount" for compensation for Wife and nothing whatever for Husband. If appropriate compensation for their services were deduct-

ed, it is evident the "profit" would be substantially lower. Wife's first point is denied.

We next address child support.

At time of trial, the parties' eldest child, Mary Helen, was a student at Vanderbilt University, and was scheduled to graduate in 1996—about the time she reaches age 22.

The decree orders Husband to "pay the remainder of college expenses, including tuition, books, fees, room and board for Mary Helen ... at Vanderbilt." Neither party quarrels with that portion of the decree.

At time of trial, the parties' middle child, Carmen Marie, was a high school senior. According to Wife, Carmen was planning to attend college after finishing high school.

The parties' youngest child, Nancy Michele, was a high school sophomore at time of trial.

The decree orders Husband to pay Wife $1028 per month per child for support of Carmen and Nancy. The decree further orders Husband to provide "prescription medication" to Wife and the minor children so long as Husband owns his own pharmacy, up to a maximum of $100 per month for Wife. The decree further orders Husband "to provide automobile insurance, license and title expenses for the minor children at no cost to [Wife] or the minor children," and to maintain "health insurance" on the children at "current levels of coverage." Any uncovered medical expenses up to $500 annually per child are to be paid by Husband, with any excess divided equally between him and Wife.

In addition to those duties, the decree orders Husband to "pay the college expenses of Carmen ... and Nancy ... for a total of up to eight semesters each at a cost not to exceed the charges for tuition, books, room and board then in effect at the University of Missouri at Columbia." [2]

Finally, the decree provides that Husband's child support obligation shall "be reduced by ... $500 per month per child for each month when Carmen ... and/or Nancy

... are attending college and not residing at the home of [Wife]."

Wife's fourth point complains about the child support for Carmen and Nancy in two respects. First, Wife proclaims the amount is too low.

We have carefully studied the evidence, together with Wife's briefs and Husband's brief on that issue. We find the amount is supported by substantial evidence and is not against the weight of the evidence, and that an opinion setting forth all of the evidence on that issue would have no precedential value. Accordingly, the portion of the decree ordering Husband to pay Wife child support of $1028 per month per child for Carmen and Nancy is affirmed in compliance with Rule 84.16(b)(1).

■ Wife's second complaint about the child support is that the trial court erred in ordering the $500 per month reduction per child for each month when each child attends college and does not reside at Wife's home.

As reported in the second paragraph of this opinion, Husband's second point in his appeal asserts the trial court erred in not granting Husband a total abatement of child support for each child during each month when each child attends college and does not reside at Wife's home. Husband argues that because he must bear all college expenses of Carmen and Nancy, plus their health insurance, medication expenses and automobile expenses, Wife will incur little, if any, expenses for Carmen and Nancy if they attend college and do not reside with Wife.

Husband cites *Gordon v. Gordon*, 924 S.W.2d 529 (Mo.App. W.D.1996), for the proposition that when a child leaves the home of the custodial parent to attend college, and the non-custodial parent pays the child's college expenses, such a change in circumstances justifies a modification in the non-custodial parent's child support obligation to the custodial parent.

We have no quarrel with that proposition. However, *Gordon* addressed a motion to

---

**2.** Although an argument might be made that this provision is too vague to be enforced, *see Echele v. Echele*, 782 S.W.2d 430, 433–37 (Mo.App. E.D.

1989), no such contention is presented in these appeals.

modify filed *after* the child began college, *id.* at 531, whereas here the decree grants a *prospective* modification if either Carmen or Nancy (or both) attend college and reside elsewhere than with Wife.

In *Wiebusch v. Deke*, 762 S.W.2d 521 (Mo. App. W.D.1988), the trial court ordered an increase in child support for the eldest of the parties' three children because the child had enrolled in college. Additionally, the trial court ordered the non-custodial parent to pay $4,500 toward the college expenses in three future annual installments of $1,500 each. *Id.* at 522. Reversing the latter award, the appellate court held: "The court is limited in determining an award of child support to demonstrable current needs, leaving for future disposition by modification any adjustments required by substantial and continuing changes in circumstances." *Id.* at 524[4].

The same rationale applies here. It is impossible to determine what Wife's reasonable expenses for Carmen and Nancy will be if each leaves Wife's residence to attend college. Wife's expenses for each may drop by less than $500 per month or by more than that sum. Husband identifies no evidence to support a finding that Wife's expenses for Carmen or Nancy will drop by $500 per month (each), or by any amount near that sum, in any month when each attends college and does not reside with Wife. Consequently, the provision granting Husband a $500 per month per child reduction in child support for each month when each child attends college and does not reside with Wife is without evidentiary support and must be set aside.

For the same reason, Husband's second point, which assigns error in the trial court's failure to totally abate child support for Carmen and Nancy for each month when each attends college and does not reside at Wife's home, is without merit. If Carmen and Nancy attend college and reside elsewhere than with Wife, Husband can seek modification of child support based on the circumstances as they exist at such time.

We recognize the trial court, in a commendable effort to spare the parties the expense of a modification proceeding, attempted to forecast the future by providing for the prospective modification. However, the positions of the parties in these appeals—one arguing there should be no reduction and the other arguing that child support should be totally abated—demonstrate the conjecture and speculation inherent in a prospective modification, a practice condemned in *Wiebusch*, 762 S.W.2d at 524. Husband's second point is denied.

We now turn to Wife's second point. It avers the trial court erred in awarding Wife less than half the "net marital estate."

The trial court awarded Wife the marital home, valued by the court at $188,000. It was encumbered by a lien securing a $71,335 debt. The trial court ordered Husband to pay the debt and save Wife harmless thereon.

At time of trial, Wife was driving a 1995 motor vehicle, leased by the pharmacy. The trial court valued the vehicle at $19,250 and ordered Husband to pay off the lease and deliver the title to Wife, debt-free.

In addition to the residence and vehicle, the trial court awarded Wife other marital property plus a judgment against Husband for $65,000. The judgment is to be paid in monthly installments of at least $1,000, and is to bear interest at seven percent per annum.

The trial court assigned Wife debts totaling $1,000.

The aggregate value of the marital property awarded Wife (assuming Husband pays off the residence debt and the vehicle lease), combined with the $65,000 judgment, and reduced by the $1,000 debts, is $410,703.25.

As recounted earlier, the trial court awarded Husband the pharmacy. The trial court also awarded Husband the business real estate, which was encumbered by a lien securing a $184,939 debt. The aggregate value of the marital assets awarded Husband (including the pharmacy at the $267,684 value fixed by the trial court) was $759,929.34. However, the debts assigned Husband by the trial court, some of which have been noted earlier, totaled $312,274, leaving Husband with marital assets exceeding liabilities by $447,655.34, an amount $36,952.09 higher than the net value of the marital assets awarded Wife. As underscored by Wife, this

results in Husband receiving 52.2 percent of the net marital estate, while she receives 47.8 percent. Wife reminds us that although the division of marital property need not be equal, it must be just and equitable. *Johnson v. Johnson*, 894 S.W.2d 245, 248[9] (Mo. App. E.D.1995).

Citing § 452.330.1, RSMo 1994, Wife asserts she should have received a greater share of the marital property because of Husband's misconduct in carrying on an affair with Nancy Barker, a liaison that began in the autumn of 1993, during the twenty-seventh year of the parties' marriage. Wife argues that the affair was the most significant factor in the destruction of the marriage.

The decree demonstrates the trial court took the affair into account. However, the court found the parties' marriage was afflicted with difficulties for some ten years, long before Husband became enamored of Ms. Barker. There was ample evidence to support that finding. Wife cites no evidence of any other infidelity (or other misconduct) by Husband.

The trial court found Husband's affair did not warrant a "substantially disproportionate division of the marital property" which the parties acquired by their joint effort throughout the marriage.

A trial court is vested with considerable discretion in dividing marital property, and an appellate court will interfere only if the division is so heavily and unduly weighted in favor of one party as to amount to an abuse of discretion. *Dardick v. Dardick*, 670 S.W.2d 865, 869[5] (Mo. banc 1984). Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the court abused its discretion. *State ex rel. Webster v. Lehn-*

*dorff Geneva, Inc.*, 744 S.W.2d 801, 804[1] (Mo. banc 1988).

Measured by that standard,[3] and mindful there was evidence that Wife had personality traits which, according to Husband, had a role in the gradual erosion of the marriage, we cannot convict the trial court of error in the division of marital property. Wife's second point is denied.

■ The final issue is maintenance. The decree orders Husband to pay Wife $1,735 per month. Wife's third point argues that is not enough. Husband's first point avers Wife should not receive any maintenance.

The eligibility requirements for maintenance are set forth in § 452.335.1, RSMo 1994.

■ In reviewing a maintenance award, an appellate court views the evidence and permissible inferences favorably to the decree, disregarding contrary evidence. *Ritter v. Ritter*, 920 S.W.2d 151, 154[1] (Mo.App. W.D. 1996); *Buckner v. Buckner*, 912 S.W.2d 65, 68[1] (Mo.App. W.D.1995). Viewing the evidence that way, we hold the trial court's finding that Wife was entitled to maintenance is supported by substantial evidence and is not against the weight of the evidence. Additionally, we determine that an opinion containing a detailed account of the evidence regarding Wife's eligibility for maintenance would have no precedential value. Accordingly, the trial court's finding that Wife was entitled to maintenance is affirmed in compliance with Rule 84.16(b)(1). Husband's first point is denied.

As to Wife's complaint that the amount is too low, we note a trial court has broad discretion in determining the amount of maintenance, and an appellate court will not interfere absent an abuse of discretion. *Colabianchi v. Colabianchi*, 646 S.W.2d 61, 66[8] (Mo. banc 1983). Applying that standard, we hold the trial court did not abuse its discretion in setting maintenance at $1,735 per month, that no error of law appears in

3. In Thomas A. Sheehan, *Standard of Review on Appeal*, Vol. 53, Journal of The Missouri Bar, No. 5, p. 281, the author points out that one of the essential tasks in evaluating the likelihood of success on appeal is to identify the standard of

review for the issue being presented. The author explains: "The most deferential standard of review, the abuse of discretion standard, severely limits the power of the appellate court to reverse or otherwise alter the rulings of the lower court."

that determination, and that an opinion narrating the evidence on that issue would have no precedential value. Accordingly, the maintenance award is affirmed in compliance with Rule 84.16(b)(5). Wife's third point is denied.

The decree of dissolution of marriage is affirmed in all respects except the provision reducing child support for Carmen Marie Stephens and Nancy Michele Stephens by $500 per month per child for each month when each child attends college and does not reside at Wife's home. That provision is reversed.

Costs of these appeals are taxed half against Wife and half against Husband.

GARRISON, P.J., and PREWITT, J., concur.