In re the MARRIAGE OF John Digby PAHLOW, Jr. and Linda Faye Pahlow.

John Digby Pahlow, Jr., Appellant,

v.

Linda Faye Pahlow, Respondent.

No. 23424.

Missouri Court of Appeals,
Southern District,
Division Two.

March 20, 2001.

Wm. G. McCaffree, McCaffree, Landoll & Slaby, Nevada, for Appellant.

C. Ronald Baird & Dana L. Kollar, Baird, Lightner & Millsap, Springfield, for Respondent.

BARNEY, Chief Judge.

John Digby Pahlow, Jr. ("Husband") appeals from an Amended Judgment of Dissolution ("judgment") which dissolved his marriage to Linda Faye Pahlow ("Wife"). In its judgment the trial court, *inter alia*, set off to Husband non-marital assets valued at $210,574.00, and set off to Wife non-marital assets valued at $19,785.00. In its division of marital property, the trial court

awarded Wife $335,455.35 in marital assets, including $45,000.00 in cash for purposes of equalizing the division of marital assets, subject to debts of $145,261.00. The trial court noted that save for the $45,000.00, the marital assets awarded Wife were not "income producing property," and that Wife was obligated to pay her own attorney's fees and litigation expenses out of the cash awarded her. The trial court awarded Husband marital assets worth $453,134.89, subject to debts of $386,589.85. The trial court also ordered Husband to pay Wife $2,750.00 per month as modifiable maintenance until the death of either of the parties.

Husband posits two major points of trial court error on appeal. First, Husband claims the trial court erred in "classifying the Trim Fast debt and funds as marital and in awarding them to Wife." Second, Husband claims the trial court erred in "ordering Husband to pay maintenance in the amount of $2,750 monthly...." Both points are discussed below.

■■■ "On appeal of a dissolution of marriage proceeding, we review the evidence in the light most favorable to the trial court's decision." *Taylor v. Taylor,* 12 S.W.3d 340, 344 (Mo.App.2000). "The party challenging the dissolution decree has the burden of demonstrating error." *Id.* "We will affirm the trial court's decree unless there is no substantial evidence to support the decision, the decision is against the weight of the evidence, or the decision erroneously declares or misapplies the law." *Id.* "A trial court is 'free to believe or disbelieve all, part or none of the testimony of any witness.'" *In re Marriage of Thompson,* 24 S.W.3d 751, 755 (Mo.App.2000)(quoting *In re Marriage of Stephens,* 954 S.W.2d 672, 675 (Mo.App. 1997)).

The record shows that Husband and Wife were married November 4, 1966, and separated on October 11, 1997. Husband's family are longtime, influential residents of Barton County. Husband began working full time in his family's abstract title business—Pahlow and Pahlow—in 1972. For the past 27 years, he has worked in the family business primarily providing abstracts, title insurance, loans, and escrow and closing services. Husband also holds a realtor license and a license to sell title insurance and annuities. He has also been employed as a branch manager with Team Bank and makes money from other business ventures. Wife forwent college at the urging of Husband and has been primarily occupied throughout the marriage as a full time mother and homemaker. Husband was completely in charge of the parties' finances.

The record also reveals that Husband has suffered from alcoholism but sought treatment in 1993 and claims his drinking is now controlled. Wife presented evidence that Husband physically and verbally abused her at times during the marriage, the frequency of the abuse increasing due to Husband's heavy use of alcohol. Further, Wife presented evidence that Husband had a number of affairs during the marriage. It was undisputed that Husband began an affair with Marsha Hardin, an old girlfriend, prior to filing for dissolution of his marriage.

The parties have two emancipated children and are also the appointed joint guardians of their grandson.[1]

## I.

■■ In his first point on appeal, Husband claims the trial court erred in classifying the "Trim Fast debt and funds as

1. The parties' daughter, Lisa Kranker, has been a source of stress in their lives. She has had numerous legal, monetary and mental problems. Lisa gave birth to a son, Trenton Gabrielle Kranker, on June 2, 1995. According to the amended judgment, Husband and Wife were appointed as joint guardians of

their grandson by the Circuit Court of Barton County, Missouri, in Case No. CV297–72P. A custody plan was entered pursuant to the joint guardianship whereby Wife has primary physical custody of the minor child, subject to reasonable specific visitation with Husband.

marital...." Husband posits that the debt and funds were his separately because "the lender intended to and had the right to look only to the Husband for collection, Husband's non-marital property provided security, the proceeds (both stock and liquidation check) were titled in Husband's separate name, and the source of repayment and intent to repay was solely that of Husband."

■ In a dissolution of marriage proceeding, the court awards each spouse his or her non-marital property and then the court divides the remaining marital property and debts in a just manner after considering all the relevant factors. § 452.330.1.[2] "The trial court is vested with great flexibility and discretion in its division of property pursuant to section 452.330." *Rivers v. Rivers,* 21 S.W.3d 117, 123 (Mo.App.2000). Likewise, "[i]n dividing marital debt, the trial court is vested with broad discretion in determining how and in what manner the debts should be divided, and this court will not disturb its division absent a clear showing of abuse of discretion." *Id.* at 122.

The law does not require an equal division of marital property, but the division must be fair and equitable after taking into consideration the factors enumerated in section 452.330.1. *Wright v. Wright,* 1 S.W.3d 52, 60 (Mo.App.1999); *Ray v. Ray,* 877 S.W.2d 648, 651 (Mo. App. W.D.1994). A reviewing court must defer to the trial court's marital property division unless it is improper under the principles of *Murphy v. Carron,* 536 S.W.2d at 32, or is an abuse of discretion. *Ray,* 877 S.W.2d at 651. The division of property is presumed to be correct, and the party challenging the division bears the burden of overcoming the presumption. *Id.* The fact that the trial court awarded one party a considerably higher percentage of the marital property than it awarded the other is not *per se* an abuse of discretion. *Id.*

*Rivers,* 21 S.W.3d at 123.

Following the parties' separation, Husband borrowed $55,000.00 from Vernon and Viola Ring, late in the month of April 1999. Husband used $10,000.00 of the money to pay some of Wife's attorney's fees and used the other $45,000.00 to purchase 10,000 shares of stock in "TrimFast Group, Inc."[3] The loan was secured by a deed of trust on a family farm, of which Husband retains a 1/5 interest as his separate property. Early in the trial, and in his exhibits, Husband represented that he had sold the 10,000 shares of TrimFast stock on July 30, 1999, for $6.80 a share and that he was waiting for a check for between $65,000.00 and $68,000.00, depending on what the brokerage fees would be. Later in the trial, Husband informed the court that he evidently had not sold the stock and that he had been notified that he only had $45,000.00 worth of stock. He subsequently deposited a check with the court for that amount from "Millennium Health Care Products, Inc."—evidently a company connected with TrimFast Group, Inc.[4] The trial court found that the $55,000.00 debt to the Vernon and Viola Ring was a marital debt, and that the TrimFast stock was a marital asset and was worth $68,000.00.[5]

■ Under section 452.330.2–.4:

**2.** All statutory references are to RSMo Cum. Supp.1999, unless otherwise noted.

**3.** Husband had previously used $2,200.00 of non-marital funds to purchase 2200 shares of TrimFast stock at $1.00 per share.

**4.** The evidence showed that Millennium Health Care Products, Inc. was owned by Mike Muzzio. Husband was, at the time, dating one Marsha Hardin. Marsha Hardin's daughter was Mr. Muzzio's girlfriend; Marsha Hardin's brother worked for Millennium.

**5.** The trial court also found "the testimony of [Husband] and Marsh Hardin [sic] to not be credible" and further found that "the circumstances surrounding the proceeds of the TrimFast stock are suspicious at best and fraudulent at worst."

2. For purposes of sections 452.300 to 452.415 only, **"marital property"** means all property acquired by either spouse subsequent to the marriage except:

    (1) Property acquired by gift, bequest, devise, or descent;

    (2) Property acquired in exchange for property acquired prior to the marriage or in exchange for property acquired by gift, bequest, devise, or descent;

    (3) Property acquired by a spouse after a decree of legal separation;

    (4) Property excluded by valid written agreement of the parties; and

    (5) The increase in value of property acquired prior to the marriage or pursuant to subdivisions (1) to (4) of this subsection, unless marital assets including labor, have contributed to such increases and then only to the extent of such contributions.

3. All property acquired by either spouse subsequent to the marriage and prior to a decree of legal separation or dissolution of marriage is presumed to be marital property regardless of whether title is held individually or by the spouses in some form of co-ownership such as joint tenancy, tenancy in common, tenancy by the entirety, and community property. The presumption of marital property is overcome by a showing that the property was acquired by a method listed in subsection 2 of this section.

4. Property which would otherwise be nonmarital property shall not become marital property solely because it may have become commingled with marital property.

§ 452.330.2–.4. "[I]t is presumed that all property acquired by either spouse subsequent to the separation of the parties but prior to the dissolution decree is marital property...." *Bullard v. Bullard,* 929 S.W.2d 942, 946 (Mo.App.1996). "The party questioning the presumption of marital property has the burden of rebutting the presumption by clear and convincing evi-

dence." *Randolph v. Randolph,* 8 S.W.3d 160, 167 (Mo.App.1999).

Husband is correct in pointing out that the debt was secured by his separate property and that Wife was unaware of the loan transaction or the subsequent purchase of stock. However, "[t]he phrase 'marital debts' encompasses all debts incurred during the marriage, either jointly or separately," *Hughes v. Hughes,* 994 S.W.2d 103, 107 (Mo.App.1999), and "[t]he fact that a spouse does not control or participate in the decision to make a particular debt does not preclude allocation of that debt to the non-participating spouse." *Id.; see also Rivers,* 21 S.W.3d at 123. Here, Husband borrowed money from the Rings partly to pay some of Wife's attorney fees for the dissolution of marriage action. Further, the court expressly found that Husband's testimony was not credible. Although Husband borrowed the money in question and purchased the stock after the parties had commenced their preparations for divorce, we cannot say the trial court erred in not accepting Husband's contention that these were not marital transactions. The funds borrowed were borrowed after the parties separated but while they were still married and are presumed marital. *Bullard,* 929 S.W.2d at 946. The funds do not fit under any of the subcategories of section 452.330.2, relating to nonmarital property. Accordingly, we find that Husband did not prove by clear and convincing evidence that the proceeds from the Ring loan—and the stock that was subsequently purchased by the loan proceeds—was not marital in nature. Husband's first point on appeal is denied.

II.

In his second point on appeal, comprised of three sub-points, Husband essentially complains that the trial court erred in ordering him to pay $2,750.00 per month in maintenance because: (1) it improperly imputed $50,000.00 in annual earning capacity to Husband; (2) it failed

to balance Wife's reasonable needs with Husband's present ability to meet those needs, considering their financial reverses of the past and the fact that Husband was awarded the majority of the marital debt; and (3) it "erroneously charged Husband with assets previously expended on debt and erroneously omitted debt uncontroverted in the evidence."

An appellate court must affirm the circuit court's award of maintenance unless there is no substantial evidence to support the award, it is against the weight of the evidence, or it erroneously declares or applies the law. *Buckner v. Buckner*, 912 S.W.2d 65, 68 (Mo.App. W.D.1995). We afford the circuit court a great deal of discretion in awarding maintenance. *Id.* In the absence of a finding that the amount is patently unwarranted and wholly beyond the means of the spouse who pays, this court will not interfere with the circuit court's award of maintenance. *Petty v. Petty*, 739 S.W.2d 738, 741 (Mo.App. E.D.1987). Husband, who contends the circuit court erred in awarding *any* maintenance to wife, bears the burden of proving the maintenance award "shocks" this court's sense of justice. *Allen v. Allen*, 927 S.W.2d 881, 885 (Mo.App. W.D.1996).

*Burnett v. Burnett*, 18 S.W.3d 27, 29 (Mo. App.2000). The trial court's determination of the amount of maintenance to be awarded, if any, is governed by section 452.335, RSMo 1994. Under that section, the court may grant a maintenance order to either spouse, but only if it finds that the spouse seeking maintenance:

(1) Lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs; and

(2) Is unable to support himself through appropriate employment or is the custodian of a child whose condition or circumstances make it appropriate that the custodian not be required to seek employment outside the home.

§ 452.335.1, RSMo 1994; *Burnett*, 18 S.W.3d at 29.[6] Further, the maintenance order shall be "in such amounts and for such periods of time as the court deems just. . . ." § 452.335.2, RSMo 1994. The court, in making this determination, is to consider "all relevant factors" including, but not limited to:

(1) The financial resources of the party seeking maintenance, including marital property apportioned to him, and his ability to meet his needs independently, including the extent to which a provision for support of a child living with the party includes a sum for that party as custodian;

(2) The time necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment;

(3) The comparative earning capacity of each spouse;

(4) The standard of living established during the marriage;

(5) The obligations and assets, including the marital property apportioned to him and the separate property of each party;

(6) The duration of the marriage;

(7) The age, and the physical and emotional condition of the spouse seeking maintenance;

(8) The ability of the spouse from whom maintenance is sought to meet his needs while meeting those of the spouse seeking maintenance;

(9) The conduct of the parties during the marriage; and

(10) Any other relevant factors.

§ 452.335.2; *see also Burnett*, 18 S.W.3d at 31.[7] However, the award must have

---

6. As the trial court noted in its judgment, Husband does not contend that there should be no maintenance award, he contends that $2,750.00 per month is far greater than what Wife needs, or he is able to pay.

7. "These factors are neither all inclusive nor mandatory, so that the trial court is not required to specifically address each factor." *Burnett*, 18 S.W.3d at 31(quoting *Monsees v.*

been made within a reasonable tolerance of proof, it cannot stand without evidence to support it, and we will intervene where the amount is patently unwarranted or wholly beyond the means of the spouse ordered to pay. *See Halupa v. Halupa,* 943 S.W.2d 272, 277 (Mo.App.1997).

## POINT II(3)

For the purpose of clarity, we shall initially address the third sub-point in Husband's Point II, in which he claims that the trial court erred in ordering him to pay $2,750.00 per month in maintenance because:

> It failed to properly consider the correct amount of assets and debt apportioned to Husband and the absence of income from those assets in that it erroneously charged Husband with assets previously expended on debt and erroneously omitted debt uncontroverted in the evidence.

This sub-point violates Rule 84.04(d),[8] which reads in pertinent part:

> (1) Where the appellate court reviews the decision of a trial court, each point shall:

>> (A) identify the trial court ruling or action that the appellant challenges;

>> (B) state concisely the legal reasons for the appellant's claim of reversible error; and

>> (C) explain in summary fashion why, in the context of the case, those legal reasons support the claim of reversible error.

> The point shall be in substantially the following form: "The trial court erred in [*identify the challenged ruling or action*], because [*state the legal reasons for the claim of reversible error*], in that [*explain why the legal reasons, in the context of the case, support the claim of reversible error*]."

*Monsees,* 908 S.W.2d 812, 818 (Mo.App. 1995)).

**8.** All rule references are to Missouri Court Rules (2000).

Rule 84.04(d)(1). Specifically, Husband's sub-point fails to explain in summary fashion why, *in the context of the case,* those legal reasons support to claim of reversible error. Rule 84.04(d)(1)(C). He fails to identify exactly what assets and debts he is referring to in his sub-point and why any such error required reversal. "[A]llegations of error … not properly briefed shall not be considered in any civil appeal…." Rule 84.13(a); *Mayes v. Mayes,* 941 S.W.2d 37, 38 (Mo.App.1997). "Compliance with Rule 84.04 briefing requirements is mandatory, partly to ensure that appellate courts do not become advocates by speculating on facts and arguments which have not been made." *Mayes,* 941 S.W.2d at 38–39. Here, Husband's argument section fails to shed much light on his exact complaints as to his final sub-point.

Further, as noted previously, Husband's second point is divided into three sub-points. However, the argument section of his brief following his second point is divided into five sections, each discussing one of following five "contested findings":

1. Income should be imputed—the amount was reasonably $50,000.

2. Husband mismanaged his business and all financial affairs.

3. Husband intentionally quit Team Bank to reduce income.

4. Wife's reasonable needs were $59,784 annually.

5. Husband was able to meet his needs and debt load while helping meet the needs of wife.[9]

As best we can discern, the first three "contested findings" relate to Husband's first sub-point, and the last two contested findings relate to Husband's second sub-point. However, as to Husband's third sub-point, we find references at a number

**9.** This fifth and final section is again divided into four sub-sections.

of different places in the argument section to trial court findings as to the various assets and debts, both marital and separate, assigned to Husband. "It is not the duty of an appellate court to seine the record in order to discover, if possible, error by the trial court; it is the duty of an appellant to distinctly point out the alleged errors and where they can be found in the record." *In re Marriage of Kirkham*, 975 S.W.2d 500, 506 (Mo.App.1998)(quoting *Bowls v. Scarborough*, 950 S.W.2d 691, 703 (Mo.App.1997)). We have, however, gratuitously examined the record concerning the trial court's consideration of the assets and debts awarded Husband for plain error resulting in manifest injustice or miscarriage of justice. *See* Rule 84.13(c). We find none. *See Ross v. Ross*, 888 S.W.2d 734, 736 (Mo.App.1994). Husband's Point II(3) is denied.

### POINT II(1) and (2)

▮▮▮ We now return to the first two sub-points in Husband's Point II, relative to the trial court's maintenance award to Wife. In these sub-points, Husband contends: (1) that the trial court erred in imputing $50,000.00 in annual earning capacity to Husband; and, essentially, (2) that the trial court failed to balance Wife's reasonable needs with Husband's present ability to meet those needs. These claims are closely related and will be discussed together. "We presume the trial court considered all of the evidence in making its determinations." *Halupa v. Halupa*, 980 S.W.2d 325, 331 (Mo.App.1998). "The judgment of the trial court must be affirmed under any reasonable theory supported by the evidence." *Id.* We defer to its findings as to maintenance, even though the evidence could support a different conclusion, due to its superior position to judge witness credibility, sincerity, and character and other intangibles not revealed in a transcript. *Ansley v. Ansley*, 15 S.W.3d 28, 32 (Mo.App.2000).

▮▮▮ Regarding maintenance, the trial court found:

[Husband] contends that his earning capacity is extremely limited. [Husband] testified that he believes that he does not possess a future in the banking industry. [Husband] also testified that based upon the earnings of Pahlow and Pahlow Abstract Company in the past, and the competition in the area, he does not believe that his abstract business will be financially lucrative. However, it is clear from [Husband's] testimony that he has not actively worked in actively [sic] or managed his abstract business.

The trial court further found that although Husband claimed to have "a negative income of $351.00" the court believed that "[Husband] has mismanaged Pahlow and Pahlow and all of his financial affairs" and that he "has actively attempted to decrease his income during the dependency [sic] of this litigation in our [sic] to avoid paying [Wife] maintenance." Additionally, the court found that "[Husband] has attempted to conceal assets as evidenced by the fact that his property and liability list ... has been drafted twenty-one (21) times, and by the time of trial assets were still being discovered ... or the values ... being changed...." "[T]he trial court is in the best position to judge the credibility of witnesses." *Burnett*, 18 S.W.3d at 31. The court determined that Husband could "produce income sufficient to meet his needs while assisting [Wife] in meeting hers" and that "[Husband's] lack of diligence in this regard is directly related to the pending litigation and that if [Husband] put forth his full effort, he would have a significant potential earning capacity of approximately $50,000.00 per year."

The trial court found that Husband quit a job with Team Bank that paid him $24,500.00 per year and that he voluntarily relinquished 12 months of rental income from Team Bank at $1,250.00 per month. Husband claims that he quit because Team Bank "moved the business out of the abstract plant ... and adopted a course of demanding a full half day of time at their new location[,] together with exhaustive

reports on business development from [H]usband."[10] Husband claimed this change "created a logistical impossibility and hurt the maintenance of the abstract office" and that he further feared that a relationship with Team Bank would hurt the abstract business "because the other four banks in Lamar saw [H]usband as a competitor."[11]

According to Husband's evidence, the abstract business had a cash flow of $14,402.00 per year, which did not cover much more than the $10,159.00 per year loan payment on the building that the business was located in, and the $3,600.00 per year paid to Husband for his auto expense. However, as previously recited, Husband evidently relinquished a $24,500.00 per year job so the abstract business would not be damaged. Husband also was offered $40,000.00 per year to work for "Heritage Bank." Husband complains that Wife had forbidden him to work for Heritage bank at the time. It is unclear whether the offer is still available or whether other similar offers would be available. Furthermore, evidence was presented that Husband had supplemented his income over the years with a number of activities. He is licensed both as a real estate broker and an insurance/annuities salesman. He earns rent on a pharmacy building he owns. He has earned fees for being on various boards, from being a court appointed guardian, and from brokering loans. He also has some minor farm income. Finally, Husband testified that he is capable of doing many things and that he hoped he could make $60,000.00 a year or better. He testified "I'm just thinking about a lot of things at this point. I even thought about going back and going to school to be a chef. I just—There's a lot of things I'm thinking about." It is clear, then, that Husband is not lacking in skills or connections.[12] "A trial court may impute income in considering a party's maintenance obligation." *Nelson v. Nelson*, 14 S.W.3d 645, 650 (Mo. App.2000). We find no abuse of trial court discretion by its imputing an annual income of $50,000.00 to Husband.

As to the evidence supporting the trial court finding that Wife needed $2,750.00 per month in maintenance, Husband complains that the trial court erred in finding that her reasonable needs were "$4,982 monthly or $59,784 per year." Husband contends "[t]his determination of [W]ife's individual reasonable needs irrationally exceeds the historical average annual income of both parties. Tax returns between 1994 and 1998 report a total of $296,479.00 over five years or an average of $59,296.00."

10. Husband testified that after he realized the conditions of his employment with Team Bank—i.e., work a four hour day at the bank, submit weekly reports on his activities, and attend certain meetings in Nevada—he thought he was going to be fired. He testified: "I mean ... I just had this feeling deep down, and I did not want to be fired. I'm 55 years old. I've never been fired from a job."

11. We note that the abstract business formerly held relationships with, and Husband was employed by, "Farm and Home Savings and Loan" and "Roosevelt Bank."

12. As he noted in his brief on appeal:

[Husband] was recognized by Governor Teasedale for community leadership in 1978, served on the Community Betterment Council for the last 21 years, arranged for Christmas lighting in Lamar, chaired the effort to establish the Harry Truman Memorial at Lamar, chaired the Senior Citizen Council Effort, which built a building for seniors in Lamar. He chaired the Lamar Industrial Development Authority which brought money to Lamar to build the O'Sullivan Industries plant. He served as public administrator for the indigent.... He served as a trustee of the health department for six years and provided services to the needy.... He served as treasurer and publicity director that developed a bond issue [sic], which assisted in building the Lamar High School. He received the most prestigious award of the Rotary Club, the Paul Harris Fellowship, for community service. He served eleven years on the District Council of the Rotary Organization helping with 20,000 scholarships for outstanding students.

The trial court found, and Wife's income statement and testimony supported, a determination that Wife expected to have an after tax monthly income of $1,000.00. The court found, and the evidence showed, that "[t]he parties enjoyed an above average standard of living for the Lamar area during the course of their marriage." It further found that Wife "has not included certain 'luxuries' in her statement of expense. For example, she did not included [sic] expenses for a cell phone, disability insurance, eating out, a housekeeper, charitable contributions, golfing, pets, carpet and cleaning of her house, or vacation with her grandchild." Further, Wife's anticipated expenses included $1,372.00 per month for the mortgage payment on her home and $965.00 per month for prescription drugs and health insurance. While Husband is in reasonably good health, Wife has suffered from shingles, mononucleosis, high cholesterol, elevated blood sugar levels and emotional stress. She also has a complete tear of the left rotator cuff sustained in a fall, and her current limitations are most likely permanent. Wife also has a herniated disc component at the "C6–C7 level" that might possibly need surgical intervention. Significantly, the trial court also found that:

it is uncontroverted that the parties' health insurance was canceled because [Husband] failed to make timely insurance premiums. [Husband] was mailed overdue notices on August 9, 1999, August 16, 1999, and September 8, 1999. . . . [Wife] testified that as early as July, 1999, she personally told [Husband] that her health was deteriorating and she would be undergoing various test. [Wife] emphasized to [Husband] the importance of keeping the insurance

coverage intact and paying the premiums. [Wife] even told [Husband] to *let her know* if he was not going to pay the premiums because she would find the funds to pay them. Despite the notifications from the insurance company, and [Wife] . . . [Husband] let the insurance lapse. [Wife] testified that when she confronted [Husband] about the insurance cancellation, [Husband] merely replied, [sic] 'I can get coverage through the Veteran's Administration' and he did not seem remorseful or concerned. The Court finds that at best [Husband's] action[s] were in reckless disregard of [Wife's] well being and at worst were intentional and malicious.

Accordingly, there was sufficient evidence supporting the trial court's findings as to Wife's reasonable needs.

However, "[i]n determining the amount of maintenance, the trial court must balance the reasonable needs of the spouse seeking maintenance against the other spouse's ability to pay." *Griffin v. Griffin*, 986 S.W.2d 534, 538 (Mo.App. 1999). "An award of maintenance should not exceed the paying spouse's capacity to provide." *Id.*

Here, as previously set out, the trial court imputed income to Husband and found that, if he were to work diligently, he could have a "significant potential earning capacity of approximately $50,000.00 per year." [13] Further, Husband claimed to have monthly expenses of $9,820.00 per month. This figure, however, is inflated by amounts that Husband claimed he was paying for Wife, which he would no longer be paying after the dissolution of the marriage. Additionally, Husband also included as expenses the monthly payments on

13. There was also evidence presented that Husband received rental income of $350.00 a month from the "pharmacy building" that he owned, as well as a few hundred dollars a year of income from farm property. Husband testified he could rent the building that Pahlow and Pahlow occupied for $800.00 or $900.00 per month; however, we assume that would require the abstract business to move elsewhere. As best we discern, Husband has a ⅙ interest in 850 acres that were formerly held in his mother's revocable trust agreement. Husband conceded that the value of his interest in the land amounted to a total of approximately $142,000.00. However, there was little testimony regarding the income to Husband from this land.

the couple's debt. It is true that of the $531,850.85 in debt amassed by the parties, Husband was allocated $386,589.85. Nevertheless, this burden is partially offset by the fact that Husband received $453,134.89 of the parties' $788,590.24 marital assets. The trial court also found, and the record supports the finding, that a substantial amount of this debt was either incurred by Husband following the parties' separation or as a result of Husband's negligent or intentional mismanagement of the couple's finances. As to the "catastrophic financial reverses" that Husband points out were suffered by the parties in the last years of the marriage, the trial court found that much of the fault for those reverses was Husband's. This finding also comports with the record.

Nevertheless, given the fact that the trial court imputed to Husband earnings of $50,000.00 per year, the debt load carried by Husband, and the lack of significant income producing property as revealed by the record, we cannot calculate how Husband could afford, after taxes are considered, maintenance payments in the amount of $33,000.00 per year, even if he has modest monthly expenses. Accordingly, we reverse the award of maintenance in the amount of $33,000.00 per year as being against the weight of the evidence. *See Griffin*, 986 S.W.2d at 538. Furthermore, reviewing the fact that we have affirmed the imputation of $50,000.00 annual income to Husband, we remand the case to the trial court for entry of an award of maintenance, after considering all relevant factors as set out in § 452.335.2, RSMo 1994. To this end, the trial court may take such additional testimony and evidence as may be required.

The judgment of the trial court is affirmed in part and reversed in part, and the cause is remanded for further action by the trial court in accordance with this opinion.

PREWITT, J., concurs in part, dissents in part.

GARRISON, J., concurs.

PREWITT, Judge, concurring in part and dissenting in part.

I would affirm without modification of the judgment. Under the circumstances present, I do not believe the trial court abused its discretion in setting the amount of maintenance payable to Respondent.