Steven WANSING, Appellant,

v.

Jeanette M. WANSING, Respondent.

No. SD 29009.

Missouri Court of Appeals,
Southern District,
Division One.

Jan. 15, 2009.

Motion for Rehearing or Transfer
Denied Feb. 2, 2009.

Application for Transfer Denied
Feb. 24, 2009.

James R. Sharp, Springfield, for Appellant.

Stephen P. Seigel, Springfield, for Respondent.

**ROBERT S. BARNEY, Judge.**

Appellant Steven Wansing ("Husband") appeals the "Findings and Recommendations for Judgment and Decree of Dissolution of Marriage" ("the Judgment") entered by the Commissioner and adopted by the trial court which dissolved his marriage to Jeanette M. Wansing ("Wife").[1] Husband asserts two points of trial court error. We affirm the Judgment of the trial court.

The record reveals that the parties in this case were married on February 5, 1977, and had two emancipated children at the time of their divorce. Wife, who was fifty-five years old at the time of trial, was a stay-at-home mother by agreement of the parties during the majority of their marriage. She had a high school education, but at one point attended airline school, real estate school, took some college classes, and authored a book. Wife worked at the time of trial for a temporary agency as an office assistant and had been earning between $14.00 per hour and $17.00 per hour. Husband, who was fifty-seven years old at the time of trial, had a bachelor's degree in accounting and was employed as president of a credit union. He testified that he made $30.48 an hour plus benefits and he worked forty hours a week.

At the beginning of their marriage, the parties resided in Kansas City, Missouri, but moved to Florissant, Missouri, in 1988. In April of 1998, Husband moved to Springfield, Missouri, to take a position as president of a credit union. At that time, the parties decided Wife would remain in Florissant because their son would not graduate from high school until the spring of 1998. During that time period, Husband returned to Florissant at least once a month and Wife visited Springfield to see

---

1. Preliminarily, we note the Judgment in this matter was filed on November 1, 2007, and, per Rule 129.13(a), either party had "within fifteen days" to file a motion for rehearing. Wife filed a "Motion for Rehearing[,] Motion for New Trial[, or] Motion to Reopen Judgment" on November 13, 2007, and Husband filed a "Motion for Rehearing or in the Alternative Motion for New Trial" on November 16, 2007. Under Rule 129.13(b), the trial court had jurisdiction to rule on the motions "within forty-five days after the motion[s] [were] filed or, [the motions would be] overruled for all purposes." Accordingly, here, the trial court had jurisdiction to rule on these motions until December 31, 2007, at the latest; however, it issued no such ruling, the motions were automatically overruled under Rule 129.13, and the Judgment became final on December 31, 2007.

Thereafter, on January 3, 2008, the trial court entered a docket entry remanding the case to "Commissioner ... for purpose of assessing [the J]udgment to provide for continuing jurisdiction for [a Qualified Domestic Relations Order ("QDRO")]. In all other respects, court declines to amend [the J]udgment and otherwise denies each party's post trial motion."

On January 4, 2008, a hearing was held and on January 7, 2008, the trial court's "First Amended Findings and Recommendations for Judgment and Decree of Dissolution of Marriage" was entered. It is clear, based on case law and the Missouri Court Rules, that the trial court had no jurisdiction to enter the first amended judgment in that the trial court lost jurisdiction on December 31, 2007, when the Judgment became final. Here, the parties did not request an amendment to the judgment, but, instead, requested a rehearing in the matter or a new trial pursuant to Rule 129.13, which required the trial court to have issued a ruling by December 31, 2007. *See Dunkle v. Dunkle*, 158 S.W.3d 823, 831–32 (Mo.App.2005). It did not do so, the motions were automatically overruled, and the trial court lost jurisdiction to take any further action in this case on that date. It follows that the "First Amended Findings and Recommendations for Judgment and Decree of Dissolution of Marriage" is void in that it was entered without jurisdiction. Accordingly, the operative judgment at issue in this appeal, and ruled upon in this opinion, is the Judgment entered on November 1, 2007.

All rule references are to Missouri Court Rules (2007).

Husband.[2] While Husband was living in Springfield he continued to support Wife as he had done when the parties resided together in Florissant.

After the parties' son graduated from high school in the spring of 1998, the parties decided Wife would remain in Florissant to finish out her term on the local school board, which expired in the summer of 2000. She testified that she resigned from the school board in January of 2000 and had intended to move to Springfield to be with Husband; however, when Wife discussed moving to Springfield, Husband told her she should wait until their son, who was attending Missouri State University and living with Husband, graduated from college in 2002. Husband also told Wife that he might retire soon and return to Florissant so she should stay there and maintain the marital home.

At some point in time in 2002, Wife began to suspect Husband was being unfaithful based on, as she described it, several "scandalous" events. Husband denied that he was cheating on her and asserted he was just trying to "help out" a young woman named Lee Higgs ("Ms. Higgs"), who had a lot of problems, by allowing her to stay at his home temporarily.

Thereafter, the parties continued their "commuter marriage" arrangement as Wife termed it.[3] They took a trip together to the Bahamas in 2003 to celebrate their twenty-fifth wedding anniversary and even purchased "a timeshare packet" at that time.[4] According to Wife, in November of 2003 she discovered Ms. Higgs was residing with Husband in Springfield. She confronted Husband at that time and Husband admitted Ms. Higgs had been living at his home since July of that year along with her son. Wife testified at trial she believed Appellant had an ongoing sexual relationship with Ms. Higgs from 2003 until the time of trial. She stated Husband told her "at first, [Ms. Higgs] was a renter, and then things changed."

In 2004, the parties took a trip to Mexico together although they slept in separate rooms. After returning from Mexico, Wife decided that instead of moving to Springfield she would remain in Florissant to campaign for State Representative, an election she ultimately lost.

Husband filed for dissolution of their marriage in December of 2005. Husband continued to provide Wife with approximately $1,000.00 per month following the filing of the dissolution of marriage petition and continued to make the house payment on the marital home. Even though their divorce was pending, Wife moved to Springfield in January of 2006 and lived with Husband in the parties' home in Springfield until Husband "threw [her] out" in March of 2006. She stated that she and Husband slept in the same bed during that time and that Ms. Higgs was also residing at the house. After Husband changed the locks on the Springfield house in March of 2006, Wife returned to their home in Florissant.

In June of 2006 Husband stopped providing Wife with money for living expenses and began paying her but $150.00 a month

---

2. Wife testified that Husband purchased a two-bedroom home in Springfield some time in the summer of 1998 without consulting with Wife. According to Wife, Husband "put money down on this house behind [her] back" and she had no knowledge of the transaction until she was contacted by a real estate agent about signing the paperwork.

3. We note Husband asserted at trial and on appeal that the parties separated in 1998 when he moved to Springfield and remained separated through the time of trial.

4. Husband stated he went to the Bahamas with Wife in 2003 but he "did not go to celebrate an anniversary," because he felt at that time his marriage was already over.

per court order in addition to making the monthly house payment. She stated that at that time she was unemployed and was unable to afford groceries or pay her bills. She related she "went to the food line" for groceries, her family helped her, she took a job with a temporary agency, and she exhausted her savings in an effort to make ends meet. She stated that during that time she often charged living expenses such as car repairs, medical bills and groceries to the parties' joint credit card until Husband cancelled the credit card in December of 2006 without her knowledge. Unable to pay her bills, Wife moved in with her parents for several months until she was able to get another temporary job in February of 2006, a position she held at the time of trial.

Wife also testified she was in ill health. She related she survived pancreatic cancer and continues to have difficulties with her pancreas; she was on medicine for depression and anxiety; and she had been diagnosed with "Phase III Adrenal Burnout due to continued stress." Wife also related that the parties' home in Florissant, where she resides, is in need of major repairs and she did not have the money to make the repairs. She related she was forced to get a hotel room to be in Springfield for three days for the trial in this matter, but that when she has previously appeared for court in Greene County she spent the night in her vehicle to save money.

Husband admitted at trial that Ms. Higgs, who is thirty-three or thirty-four years old, and her six-year-old son reside in his home in Springfield. Husband testified he had never had a sexual relationship with Ms. Higgs, and that she had been living with him continuously for the past three years. He stated she lived with him originally for a period of six months until she married and moved out. When she divorced about eighteen months later, she needed a place to stay; she moved back in with Husband; and has been at his home since that time. He stated she is physically and mentally unwell, suffers from anxiety attacks, is agoraphobic, and "has serious problems;" accordingly, the location of his home was "a big benefit" because it is "close to the hospital." Husband also related that Ms. Higgs, who is not employed, is supposed to pay him rent, but she had never given him any money. He stated he paid for food, prescriptions, personal items, transportation and other things for both Ms. Higgs and her son. Husband admitted he claimed her son as a dependent on his tax returns for the last several years but insisted he was not her boyfriend and he did not hold himself out to others as her boyfriend. He stated Ms. Higgs "still sees a couple of boyfriends ..." and had men over to the house occasionally. Also, he stated he charged a trip to Hawaii for Ms. Higgs, her son, and a friend to his credit card and she was supposed to pay him back; however, she had yet to make a payment. Additionally, he testified he loaned Ms. Higgs $5,500.00 in 2002 which she also had not paid back.

Husband stated that from 1998 until June of 2006 he provided Wife with living expenses ranging from $500.00 to $2,500.00 per month based on her needs in addition to making the house payment in Florissant and providing her with vehicle and health insurance. Husband admitted that he stopped supporting Wife in June of 2006 and stopped making contributions to his 401(k) plan, yet continued to support Ms. Higgs and her son in addition to providing some support to his own brother, who also resides with him. Husband also testified he recently purchased an $8,000.00 touring motorcycle and had taken several motorcycle trips.

The Judgment set out that Wife's annual salary is approximately $29,120.04; Husband's annual salary is $63,398.40; it valued the marital home in Florissant at $162,000.00; and it valued the home in Springfield at $80,000.00. The judgment also recited that while Wife was receiving maintenance from Husband in the amount of $150.00 per month, she no longer needed maintenance due to her earning capacity and the distribution of property she was to receive.

In dividing the parties' marital property, the trial court awarded Wife the marital home in Florissant; property in Vienna, Missouri, valued at $7,000.00; the VIVA Vacation Club membership valued at $9,800.00; the Oppenheimer IRA valued at $98,642.99; the Duke Energy IRA valued at $28,582.24; her 1997 Oldsmobile Aurora valued at $3,335.00; a Vantage Credit savings account valued at $5.01 and a savings account at the same bank with no stated value; an Alliance Credit Union Savings Account valued at $93.54; a Neighbors Credit Union Savings Account valued at $404.72; a United Fidelity Life Insurance Company policy with no stated value; and marital furniture and other personal marital property in her possession valued at $2,745.00.

The trial court awarded Husband the home in Springfield; the property interest in Lake Paradise, Inc. valued at $2,708.64; his 1997 BMW valued at $4,645.00; a 1991 S–10 pick-up truck valued at $1,105.00; a 1999 Yamaha Motorcycle valued at $8,050.00; an investment called "M.O.N.E.Y. Club of Springfield" valued at $6,174.00; a checking account at Educational Community Credit Union valued at $1,696.61; interest in a United Fidelity Insurance Policy which was given a fair market value of $5,800.54; a Fortis Benefits Insurance Company policy with no stated value; a Cigna Life Insurance Com-

pany policy with no stated value; a "SWTCU?ECCU Life Ins." policy with no stated value; a CUNA Mutual Life Insurance policy valued at $20,165.60; an Educational Community Credit Union 401(k) valued at $69,621.34; an Educational Community Credit Union IRA valued at $23,935.44; a Scottrade IRA valued at $87,510.21; and marital furniture and other personal marital property in his possession valued at $5,762.00. Husband was also ordered to assume all of the marital debt with the exception of Wife's outstanding bills for attorney fees. Specifically, in addition to the debt on property he was actually awarded, Husband was ordered to pay the mortgage on the home in Florissant on which $23,056.33 was remaining; the $9,567.01 balance on the Alliance Visa credit card; the $4,754.92 balance on the Barclay Bank Visa credit card; the $14,175.00 balance on the AARP Visa credit card; the $2,868.48 balance on the Discover Credit Card; and the $8,661.65 balance on the Juniper Bank Credit Card. Additionally, the trial court ordered Husband to pay Wife "a sum of $8,000.00 to reimburse her for attorney fees." This appeal by Husband followed.

■■■ The standard for reviewing a judgment of dissolution is the same as in any court-tried action. *Rivers v. Rivers,* 21 S.W.3d 117, 121 (Mo.App.2000). The decree must be affirmed unless it is unsupported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). "We do not retry the case, rather we accept as true the evidence and reasonable inferences therefrom in a light most favorable to the prevailing party and disregard contradictory evidence." *McCallum v. McCallum,* 128 S.W.3d 62, 65 (Mo.App.2003). Additionally, we defer to the trial court's determinations of credibili-

ty in making our review. *In re Marriage of Colley,* 984 S.W.2d 163, 166 (Mo.App. 1998).

In his first point relied on, Husband asserts the trial court erred in awarding him "95 [percent] of the marital debt against only 50 [percent] of the marital property resulting in a net 62 [percent] award of the marital estate to Wife...." He maintains the trial court's award was an abuse of discretion and not based on substantial evidence because there was evidence at trial that

> the parties had been separated for more than nine (9) years prior to the trial of the case; that the vast majority of the marital investments and retirement benefits, which made up the bulk of the marital assets, were entirely the result of Husband's contributions; and that any marital misconduct on the part of Husband did not operate as a burden to Wife that would justify a disproportionate division of the marital estate; and that at least one of the credit cards the court ordered Husband to pay was entirely incurred by Wife.

 Pursuant to section 452.330.1, the trial court in a dissolution proceeding is required to divide marital property and debts in such proportions as the court deems just after considering all relevant factors set out therein.[5] *See Rivers,* 21 S.W.3d at 122. When dividing the marital property per section 452.330.1, the trial court must consider all relevant factors including: (1) "the economic circumstances of each spouse at the time the division of property is to become effective ...;" (2) how each spouse contributed "to the acquisition of the marital property, including the contribution of a spouse as homemaker;" (3) "[t]he value of [non-marital] property set apart to each spouse;" and (4) the conduct of each spouse during the marriage. "Those factors listed in section 452.330.1 are not exhaustive, and the trial court has 'great flexibility and far-reaching power in dividing the marital property.'" *Long v. Long,* 135 S.W.3d 538, 542 (Mo. App.2004) (quoting *Farley v. Farley,* 51 S.W.3d 159, 165 (Mo.App.2001)). There is no set formula concerning the weight given to the factors considered under section 452.330. *Kester v. Kester,* 108 S.W.3d 213, 224 (Mo.App.2003). "'Disparity in the value of marital property awarded each spouse is justified if any of the relevant factors, statutory or otherwise, justify an unequal division.'" *Long,* 135 S.W.3d at 542 (quoting *Hayes v. Hayes,* 792 S.W.2d 428, 431 (Mo.App.1990)).

 A trial court is given broad discretion in dividing property in a dissolution action, and we will interfere with its decision only if the division is so unduly weighted in favor of one party that it amounts to an abuse of discretion. *Kirkwood v. Kirkwood,* 77 S.W.3d 675, 680 (Mo.App.2002). The trial court abuses its discretion only when its ruling is "clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock one's sense of justice and indicate a lack of careful consideration." *In re Marriage of Holden,* 81 S.W.3d 217, 225 (Mo. App.2002). "If reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the trial court abused its discretion." *Nelson,* 25 S.W.3d at 516. "The division of property is presumed to be correct, and the party challenging the division bears the burden of overcoming the resumption." *Rivers,* 21 S.W.3d at 123. "The fact that the trial court awarded one party a considerably higher percentage of the marital property than it awarded the other is not *per se* an

_____

5. All statutory references are to RSMo 2000.

abuse of discretion." *Id.* "The division of marital property need not be equal, but must only be fair and equitable given the circumstances of the case." *Nelson v. Nelson,* 25 S.W.3d 511, 517 (Mo.App.2000).

Having found the parties' non-marital "property [did] not significantly impact the overall division" of property, the trial court awarded Wife a residence valued at $162,000.00 and Husband was awarded a residence valued at $80,000; Wife was awarded a marital vehicle valued at $3,335.00 and Husband was awarded marital vehicles valued at $13,800.00; Wife was awarded marital investments and retirement benefits valued at $127,728.50 and Husband was awarded marital investments and retirement benefits valued at $214,903.74; and Husband was ordered to assume all the marital debt with the exclusion of Wife's outstanding bills for attorney fees. Accordingly, Wife was awarded marital property valued at $312,608.50 and Husband was awarded marital property totaling $317,174.38 as well as being ordered to assume payment of debts in the amount of $127,624.21.

■ Husband first challenges the trial court's division of the parties' "marital investments and retirement benefits" on the basis that they "were entirely the result of Husband's contributions...." "In Missouri, any property acquired after the marriage and prior to legal separation or dissolution is presumed marital property." *Davis v. Davis,* 107 S.W.3d 425, 431 (Mo. App.2003). "The presumption of marital property is overcome by a showing that the property was acquired by a method listed in [section 452.330.2]." § 452.330.3.

■ Here, the record shows the parties had been married since 1977. Husband did not introduce any evidence that any of the investments, the income used to fund the investments, or other funds were his separate property; nor did he allege these items were his non-marital property. Based on the record before this Court, it appears that all of the investment income and retirement benefits at issue were marital in nature in that "all property acquired by either spouse subsequent to the marriage" is considered to be marital property subject to division. § 452.330.2. As such, the parties' investments and other benefits could properly be divided by the trial court regardless of whether or not Husband was the sole spouse earning the income that was used to acquire the properties. *Davis,* 107 S.W.3d at 433 (holding that money invested in voluntary investment plan during marriage was marital property because it was property acquired during marriage); *In re Marriage of Cranor,* 78 S.W.3d 150, 155 (Mo.App.2002) (holding that retirement benefits are marital property because they would be a form of deferred compensation funded by money earned during the parties' marriage); *In re Marriage of Box,* 968 S.W.2d 161, 164 (Mo.App.1998). This portion of Husband's point relied on lacks merit.

Also under this point relied on Husband challenges the trial court's division on the basis that "any marital misconduct on the part of Husband did not operate as a burden to Wife that would justify a disproportionate division of the marital estate."

■ "Under [section] 452.330.1(4), the trial court is required to consider the parties' conduct during the marriage when dividing the marital property." *Nelson,* 25 S.W.3d at 519. However, misconduct by a spouse cannot be used by the court to punish that spouse by awarding a disproportionate share of the marital estate to the other spouse. *Id.; Messer v. Messer,* 41 S.W.3d 640, 643 (Mo.App.2001). The rationale for considering the misconduct of the spouses in dividing marital property is that " 'if one spouse is compelled to con-

tribute more to the partnership endeavor due to the other's misconduct, he or she is entitled to have the errant spouse's misconduct taken into consideration ... in dividing marital property.'" *In re Marriage of Ballay*, 924 S.W.2d 572, 578 (Mo. App.1996) (quoting *Fields v. Fields*, 643 S.W.2d 611, 616 (Mo.App.1982)). Thus, not all misconduct requires a disproportionate division of marital property. *Id.* "'[I]t is only when misconduct of one spouse changes the balance so that the other must assume a greater share of the partnership load that it is appropriate that such misconduct can affect the distribution of property.'" *Nelson*, 25 S.W.3d at 519 (quoting *McNair v. McNair*, 987 S.W.2d 4, 6 (Mo.App.1998)).

In the present matter, Wife and Husband decided early on in their marriage that Wife would be a homemaker and Husband would work outside the home earning wages. When Husband took the position in Springfield and Wife remained in Florissant with their son, Husband and Wife continued to visit one another and maintain the same marriage dynamics they had prior to Husband moving. At some point in time in 2001 or 2002, Ms. Higgs moved into Husband's home in Springfield and, although she moved out for a period of time, she and her child had been continually living with Husband for the three years prior to the trial in this matter. She does not work nor pay rent or other bills; yet, he supports her and her son to the extent that he claims her son on his tax returns as a dependent. Also, beginning in June of 2006, Husband was providing Ms. Higgs with the equivalent of approximately $2,500.00 worth of support each month and, on the other hand, was providing Wife $150.00 per month in court-ordered support. Wife testified that at some point in time thereafter she was forced to turn to a food bank for assistance in feeding herself and had insufficient funds with which to run the household in Florissant such that she had to move in with her parents.

Husband admitted he was still spending time with Wife until the filing of the dissolution of marriage, and that he never discussed getting a divorce with Wife until late 2005, even though he had a young woman living in his home with him for the better part of five years. Likewise, he admitted that during that time he was the sole source of support for Ms. Higgs and her son; had loaned Ms. Higgs $5,500.00 on one occasion; and had paid for her and her son's trip to Hawaii. Also, in addition to supporting Ms. Higgs and her son, Husband testified about providing support to his brother, who had recently been released from prison and also resided with him.

■■■ While we note Husband contended throughout this action that he did not have a sexual relationship with Ms. Higgs, it is clear Husband's financial and other support provided to Ms. Higgs, her son, and his brother "'change[d] the balance so that ...'" Wife was required to "'assume a greater share of the partnership load....'" *Nelson*, 25 S.W.3d at 519 (quoting *McNair*, 987 S.W.2d at 6). The trial court did not abuse its discretion in finding that Husband's marital misconduct justified awarding Wife a greater share of the marital assets.

Husband next challenges the trial court's allocation of certain marital debts to him. In the present matter, the parties had a total of $133,924.21 in marital debt including Wife's outstanding attorney fees of $6,300.00. Of this amount, Husband was ordered to assume $127,624.21 of that marital debt. Husband conceded at trial and in his reply brief that he would pay the majority of the marital debt; however, he asserts he never agreed to pay the Alliance Visa credit card debt in the

amount of $9,567.01, which he argues was a debt "incurred solely by Wife."

■■■ It is clear that "'[t]he phrase 'marital debts' encompasses all debts incurred during the marriage, either jointly or separately.'" *In re Marriage of Pahlow,* 39 S.W.3d 87, 92 (Mo.App.2001) (quoting *Hughes v. Hughes,* 994 S.W.2d 103, 107 (Mo.App.1999)). Accordingly, it is irrelevant whether the balance on the Alliance Visa was incurred by Wife or Husband in that the record is clear that the debt was incurred during the parties' marriage. Additionally, in light of Husband's misconduct detailed above and Wife's financial circumstances, especially during the last two years of the parties' marriage when Husband was not providing a great deal of support to Wife, it was not error for this particular debt to be allocated to Husband. Point One is denied.

Husband's second point relied on maintains the trial court erred in awarding Wife attorney fees in the amount of $8,000.00 because the trial court awarded her "sufficient assets with which to pay her attorney fees" and the trial court had found she "is able to support herself through her employment and the marital property awarded to her."

■■■ A trial court is given great discretion in awarding attorney fees and costs in a dissolution proceeding, and the court's decision should not be overturned unless it amounts to an abuse of discretion. *Silcox v. Silcox,* 6 S.W.3d 899, 905 (Mo. banc 1999). "The party challenging the award has the burden to prove an abuse of discretion, which will be found only where the decision is so arbitrary as to shock one's sense of justice." *Id.*

■■■ With regard to awards of attorney fees, Missouri courts generally follow the "American rule," which provides that each party should bear his or her own litigation expenses. *Cohen v. Cohen,* 73 S.W.3d 39, 55 (Mo.App.2002). "'However, a trial court may order one party to pay the other's attorney's fees and costs where such is authorized by statute.'" *Id.* (quoting *Laubinger v. Laubinger,* 5 S.W.3d 166, 181 (Mo.App.1999)). In that respect, section 452.355.1 provides that the trial court may award attorney fees to a party in a dissolution action after "considering all relevant factors including the financial resources of both parties, the merits of the case, and the actions of the parties during the pendency of the action. . . ." With that being said, "[t]he trial court is not limited to considering the financial resources of the parties in awarding attorney's fees, but may consider all relevant factors." *In re Fuldner,* 41 S.W.3d 581, 596 (Mo.App. 2001). "In awarding attorney's fees, the trial court is considered an expert in the necessity, reasonableness, and value of the legal services." *Id.* Where misconduct has taken place, a trial court may grant a partial award of attorney fees, even where the parties' financial condition does not otherwise necessitate an award of fees. *See T.B.G. v. C.A.G.,* 772 S.W.2d 653, 655 (Mo. banc 1989).

■■■ Wife testified she incurred attorney fees in the amount of $20,440.07 and she introduced evidence of those expenses at trial. Wife was not awarded all of the attorney fees she requested and the trial court specifically noted in its judgment that the amount awarded "is reasonable, considering Husband's conduct and the factors enumerated in [section] 452.355." Husband has failed to prove that this award was an abuse of discretion. *See id.* The award of attorney fees in the amount of $8,000.00 did not constitute an abuse of discretion by the trial court. *See Adair v. Adair,* 124 S.W.3d 34, 41 (Mo.App.2004). Point denied.

The Judgment of the trial court is affirmed.

BATES, J., and LYNCH, C.J., concur.